**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
Fort Pierce Division
Case No.: 9:18-cv-80311-ROSENBERG/REINHART

DIAMOND RESORTS INTERNATIONAL, INC., a Delaware corporation; DIAMOND RESORTS CORPORATION, a Maryland corporation, DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, a Delaware limited liability company, and DIAMOND RESORTS MANAGEMENT, INC., an Arizona corporation,

Plaintiffs,

v.

US CONSUMER ATTORNEYS, P.A., a Florida professional corporation; HENRY PORTNER, ESQ. an individual; and ROBERT SUSSMAN, an individual,

Defendant.

## AMENDED COMPLAINT[1]

Plaintiffs, DIAMOND RESORTS INTERNATIONAL, INC., DIAMOND RESORTS CORPORATION, DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, and DIAMOND RESORTS MANAGEMENT, INC. (collectively, "Plaintiffs" or "DIAMOND"), by and through their counsel of record, sue Defendants, US CONSUMER ATTORNEYS, P.A. ("USCA"), HENRY PORTNER, ESQ. ("Portner"), and ROBERT SUSSMAN ("Sussman")(collectively, "Defendants") and state as follows:

---

[1] This Amended Complaint is timely filed as a matter of right pursuant to Fed. R. Civ. P. 15(a)(1)(B) and in compliance with the deadlines established by the Court's Scheduling Order (Doc. 29).

## Preliminary Allegations

**A.**     **Personal and Subject Matter Jurisdiction, and Venue**

1.     This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. §§ 1331 and 1338(a) with respect to the causes of action arising under the Lanham Act.  The Court has supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to clams in this action within the Court's original jurisdiction that they form part of the same case or controversy.

2.     USCA is a professional corporation organized and existing under the laws of the state of Florida with a principal address at 6586 Hypoluxo Road, Suite 300, Lake Worth, Florida 33467.  This Court therefore has personal jurisdiction over USCA.

3.     Portner is an individual and an attorney licensed to practice law in multiple jurisdictions, including the state of Florida under Florida Bar Number 883050.  Portner is, allegedly, the principal of USCA and lists his official mailing address with The Florida Bar as being the mailing address for USCA.  Portner is a resident of the state of Florida and Palm Beach County, Florida, as he maintains a home address at 6316 Vireo Court, Lake Worth, Florida 33463.  Portner has claimed, and continues to claim, the Florida Homestead Exemption for the property located at 6316 Vireo Court.  This Court therefore has personal jurisdiction over Portner.

4.     Sussman is an individual who is, upon information and belief, the actual manager of USCA and holds himself out as the manager of USCA.  This Court therefore has personal jurisdiction over Sussman as he is actively engaged in directing and managing the actions of USCA, a Florida-registered and Florida-based professional association.  Moreover, the actions taken by the Defendants, as more fully described hereinbelow, are directed at consumers across

the country, including consumers in the state of Florida. The contacts and actions described hereinbelow, including, without limitation, the active management and running of a Florida-based business, are not isolated or limited, and are purposefully directed towards consumers in the state of Florida. This Court therefore has personal jurisdiction over Sussman.

      5.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 as Defendants are located in this district and the actions and inactions that occurred or did not occur that are complained about herein occurred in, or were directed in or from, the Southern District of Florida.

      6.     Upon information and belief, Defendants have also engaged in substantial business in the Southern District of Florida, not the least of which is filing lawsuits in the Southern District of Florida and/or compromising, with full settlement authority, lawsuits and/or other disputes in the Southern District of Florida.

**B.**      **<u>Diamond</u>**

      7.     Plaintiff DIAMOND RESORTS INTERNATIONAL, INC. ("DRI") is a Delaware corporation with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. DRI consists of, amongst others, interests in vacation ownership resorts. DRI's indirect subsidiaries – including DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC ("US COLLECTION") – offer vacation ownership programs wherein members acquire vacation ownership interests in the form of points that owners can then use to stay at various destinations. In sum, DRI is a holding company and its principal asset is the ownership of equity interests in its direct and indirect subsidiaries, including those identified herein. DRI is the parent company of DIAMOND RESORTS HOLDINGS, LLC ("DRH").

8.      DRH is similarly a holding company and the parent company of DIAMOND RESORTS CORPORATION ("DRC").

9.      Plaintiff, DRC, is a Maryland corporation with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  DRC is the parent company or ultimate parent company of several entities that conduct timeshare sales, exchange, management, and development activities throughout the United States and worldwide. DRC and its subsidiaries develop, own, operate, and manage vacation membership resorts, and through resort and partner affiliations, provide members and guests with access to managed resorts, affiliated resorts and cruise itineraries.  DRC is the 100% owner of multiple underlying DIAMOND development entities, each of which is registered in the states wherein they do business, such development entities providing timeshare interests in the form of deeded weeks or in the form of points. These development entities are the contracting party with DIAMOND timeshare owners to purchase agreements for deeded timeshare interests and/or timeshare interests in the form of points.  As part of the purchase of the timeshare interest, owners are also required to pay maintenance fees and annual assessments.  Because DRC is the 100% owner of the development entities it ultimately subsumes all the losses of its underlying development entities, and therefore, all of the damages, both current and future, as a result of litigation are encapsulated within DRC.

10.      Plaintiff US COLLECTION, as explained below, is an indirect wholly-owned subsidiary of DRI and direct subsidiary of DRC.

11.      Plaintiff US COLLECTION is a Delaware limited liability company with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  The sole member of US COLLECTION is Diamond Resorts Developer and Sales

- 4 -

Holding Company, a Delaware corporation with its principal place of business at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. US COLLECTION sells membership interests to consumers in the form of points, which, in turn, are exchanged for use of properties, including properties located in Nevada, in the Diamond Resorts US Collection, a non-specific multi-site timeshare plan. In addition to its sales functions, US COLLECTION may finance the purchase of membership interests for consumers.

12.     US COLLECTION is the contracting party with Diamond timeshare owners to purchase agreements for timeshare interests in the form of points. As part of the purchase of the timeshare interest, owners are also required to pay maintenance fees and annual assessments.

13.     US COLLECTION is registered to do business in Nevada and regularly transacts business in Nevada.

14.     Plaintiff, DIAMOND RESORTS MANAGEMENT, INC. ("DIAMOND MANAGEMENT"), is another indirect subsidiary of DRI. DIAMOND MANAGEMENT is an Arizona corporation, registered to do business in the state of Florida, with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. By way of contractual agreement, the management powers of the various DIAMOND subsidiaries and affiliated entities have delegated their management powers and rights to this DIAMOND MANAGEMENT arm exclusively. The management services delegated to the management company includes, but is not limited to, the billing and collection of maintenance and annual fees from timeshare interests.

15.     DIAMOND MANAGEMENT maintains rights and interests in the maintenance and annual fees which are impacted by Defendants' conduct. As such, DIAMOND MANAGEMENT is the real party in interest and has standing to prosecute the claims herein.

16.     DIAMOND is a global leader in the hospitality and vacation ownership industries.

17.     DIAMOND strives to provide innovations and flexibility to ensure that Diamond members and owners create their dream vacation, and strives to provide Diamond members and owners an increased sense of happiness and satisfaction in their lives, while feeling healthier and more fulfilled in their relationships, by enjoying memorable and meaningful experiences.

18.     DIAMOND is concerned not only for its own economic well-being, but for the well-being of members and owners of DIAMOND timeshare interests ("Diamond Owners"), who have also been defrauded by Defendants' wrongful conduct.

19.     DIAMOND institutes this action to redress the Defendants' illegal actions and damages suffered by DIAMOND, and to deter future wrongful conduct against DIAMOND and Diamond Owners.

20.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise occurred, been satisfied, or discharged.

21.     DIAMOND has retained the services of Shutts & Bowen LLP to represent it in this action and has obligated itself to pay reasonable attorneys' fees therefor, which fees are recoverable against Defendants as more fully set forth hereinbelow.

**C.     The Defendants**

22.     A cottage industry has arisen whereby unscrupulous companies mislead consumers, including Diamond Owners, into disrupting or otherwise breaching the valid, enforceable contracts between consumers and timeshare companies, including DIAMOND. Entities participating in this industry are known as "timeshare exit companies."  Timeshare exit companies generally promote and market themselves as having the ability to get timeshare

owners released or otherwise discharged from their contracts – including the attendant financial obligations – with timeshare developers, like DIAMOND.  While engaging in this behavior, timeshare exit companies generally promote themselves as "consumer protection firms."  At least some timeshare exit companies, including USCA (and Portner and Sussman, who direct and control USCA), fail to inform consumers that the consumers may suffer substantial harm to their finances and credit if they utilize the timeshare exit company's methods.  Thus, at least some timeshare exit companies, including Defendants, trick consumers, who otherwise may not breach their timeshare contracts, into retaining the timeshare exit company to breach those contracts.

23.     Unlike some other timeshare exit companies, USCA bills itself, and is apparently organized as, a law firm.  However, as set forth hereinabove, USCA is apparently managed and/or run, at least in part, by Sussman, a non-lawyer.

24.     It is unclear whether USCA is actually a law firm, a lawyer referral source, a lawyer directory, a combination of the foregoing, or something else entirely.  This is because, in addition to the apparently illegal or otherwise improper arrangement of having a non-lawyer with management authority over, and apparent profit-sharing in, a law firm, Defendants engage in a number of practices that appear to be incompatible with a law firm, such as:

      a. offering guaranteed results (*see* Exhibit 1 annexed hereto);

      b. running advertisements that have, upon information and belief, not been submitted to The Florida Bar (*see id.*);

      c. failing to disclose a 'home office' and locations where services are rendered;

      d. not disclosing who their attorneys are and telling consumers that they will simply be assigned an 'experienced timeshare attorney' with a hyperlink that redirects

consumers to USCA's homepage, www.usconsumerattorneys.com (*see* Exhibit 2 annexed hereto); and

     e.    claiming as 'our lawsuits' civil actions that were filed, apparently, by law firms other than USCA, such as Case No. A-17-762690-C, currently pending in the United States District Court for the District of Nevada.

25.    Many of the foregoing advertisements are considered to be "Deceptive and Inherently Misleading" by Rule 4-7.13 of the Florida Bar Rules of Professional Conduct.

26.    Defendants engage in passive 'pull' advertising on the internet by, *inter alia*, purchasing Google AdWords® and a variety of other means, as more fully described hereinbelow.

27.    Portner and Sussman both individually direct and control the actions of USCA, including the tortious and illegal conduct set forth in this Amended Complaint.

### Background and Factual Allegations Common to All Counts

**A.**    **The Timeshare Purchase**

28.    Plaintiffs conduct timeshare sales, exchange, management, and development activities throughout the United States with a worldwide network of more than 420 vacation destinations in 35 countries. The Plaintiffs' timeshare resorts have been in operation for many years and they have developed a considerable base of owners who own timeshare interests at the Plaintiffs' various resorts.

29.    At the time consumers purchase timeshares from the Plaintiffs, they execute Contracts for Purchase and Sale (a "Purchase Agreement") wherein the purchaser agrees, *inter alia*, to pay maintenance fees to the Plaintiffs for the maintenance and upkeep of the timeshare units and common areas of the timeshare properties. In addition, the purchaser agrees to pay a

pro-rated share of the property taxes to the Plaintiffs, which monies are then submitted by the Plaintiffs to the local tax collectors to satisfy tax obligations.

30.    If a purchaser desires mortgage financing, he or she may complete and submit a mortgage application; upon approval of financing, a purchaser will execute and deliver a Promissory Note and Mortgage in connection with the timeshare purchase. Both the Promissory Note and Mortgage are referenced and incorporated in the Purchase Agreement with the owners. US COLLECTION is the lender and holder of the Promissory Note and Mortgage.

31.    US COLLECTION is damaged by Defendants' tortious and illegal conduct. When the Defendants wrongfully convince Diamond Owners to breach their contracts with Plaintiffs, they cease making financing payments to US COLLECTION, thus negatively impacting US COLLECTION's revenue (and, though they are generally unaware it is occurring, the Diamond Owner's credit is negatively impacted as well).

32.    DRI is damaged by Defendants' tortious and illegal conduct because Defendants' entire business model is premised on drawing customers away from DIAMOND, disparaging the Diamond brand, and making false statements about and to DIAMOND. Moreover, because the losses resulting from Defendants' tortious conduct are reflected on the DRI's financial statements, DRI ultimately suffers financial harm as a direct result of Defendants' illegal conduct.

**B.    The Diamond Brand**

33.    DRI, through its wholly owned subsidiary DRH, is the owner of the valuable Diamond® brand.  Over the past decade, Plaintiffs have spent substantial amounts of money marketing their brand to establish its wide-spread goodwill amongst consumers and foster its

esteemed reputation throughout, *inter alia*, the hotel and resort, real estate sales management, and timeshare industries.

      34.     Plaintiffs have developed the Diamond Marks (as defined herein below) to distinguish its products and services. Plaintiffs use the Diamond Marks in its advertising, marketing, and promotional endeavors. Plaintiffs have federal registrations for a number of marks, including the Diamond Marks listed below:

| Registration Number | Trademark | Registration Date | Description of Goods and/or Services |
|---|---|---|---|
| 2,411,329 | DIAMOND RESORTS INTERNATIONAL | December 5, 2000 | IC 042: Hotel Services. |
| 2,432,190 | DIAMOND RESORTS INTERNATIONAL | February 27, 2001 | IC 036: Real estate time sharing services. |
| 3,746,815 | DIAMOND RESORTS | February 9, 2010 | IC 036: Real estate equity sharing, namely, managing and arranging for co-ownership of real estate; real estate time-sharing; vacation real estate time share exchange services; vacation real estate time-sharing. |
| 4,067,822 | DIAMOND LOYALTY | December 6, 2011 | IC 036: Real estate equity sharing, namely, managing and arranging for co-ownership of real estate; real estate services, namely, rental of short term furnished apartments; real estate time-sharing; vacation real estate time sharing; |

| | | | |
|---|---|---|---|
| | | | vacation real estate time-sharing services.<br><br>IC 038:  Providing free internet access; providing a dedicated web portal in the nature of providing access to interactive online chat room; providing dedicated reservation telephone lines for securing accommodations.<br><br>IC 043:  Travel services, namely, providing travel lodging information services and travel agency booking services for travelers; arranging for rooms in resorts, accommodation exchange and reservation services; making arrangements for travelers to extend lodging reservations, redeem unused lodging reservations, or to be allowed to waive redemption dates in connection with accommodation promotions.<br><br>IC 045:  Concierge services for others, comprising making requested personal arrangements and reservations and providing customer |

| | | | |
|---|---|---|---|
| | | | specific information to meet individual needs rendered together in a hotel and resort, apartment timeshare environment; providing customized gift baskets including bathroom amenities. |
| 4,101,489 | SHARE THE DIAMOND DIFFERENCE | February 21, 2012 | IC 036:  Real estate equity sharing, namely, managing and arranging for co-ownership of real estate; real estate time-sharing; vacation real estate time share exchange services; vacation real estate time-sharing; vacation real estate timeshare services. |
| 4,361,959 | DIAMOND RESORTS INTERNATIONAL | July 2, 2013 | IC 035:  Real estate sales management; managing and operating hotels of others. |
| 4,505,500 | DIAMOND LUXURY SELECTION | January 14, 2014 | IC 043:  Making reservations and bookings for others at hotels and residences; providing a website featuring information in the field of hotels and temporary accommodations for travelers; reserving lodging rooms for travelers. |

| 4,805,164 | DIAMOND PLUS POINTS | September 1, 2015 | IC 035: Incentive programs for credit card users, namely, providing gift cards, merchandise, and travel awards for credit card use as part of a customer loyalty program.<br><br>IC 036: Credit card services; incentive programs for credit card users, namely, providing cash and rebates for credit card use as part of a customer loyalty program. |

(collectively the "Diamond Marks"). True and correct copies of the Certificates of Registration for the Diamond Marks, and associated assignments to DRH (as appropriate), are attached hereto as Composite Exhibit 3.

35. The Diamond Marks are in full force and effect and have never been revoked or cancelled. Many of the Diamond Marks have become incontestable.

36. Plaintiffs have provided notice to the public of the registrations and ownership of the Diamond Marks by including same on general promotional, advertising, legal and other documents and materials. Additionally, by virtue of registration on the Principal Register, DRI has provided constructive notice of its claim of ownership of the Diamond Marks. Upon information and belief, Defendants have actual knowledge of the registration, and DRI's ownership, of the Diamond Marks.

37.     The federally protected Diamond Marks have become associated with a well-regarded hotel and resort, real estate sales management, and timeshare brand and have otherwise become famous.

**C.      Defendants' Infringing, False, and Misleading Advertisements**

38.     Defendants are using the Diamond Marks in its advertising to further their scheme of drawing customers away from DIAMOND.

39.     Defendants have purchased dozens of Google AdWords® incorporating the Diamond Marks.  The advertisements are false and misleading, or have the tendency to mislead, and apparently violate The Rules Regulating the Florida Bar.

40.     In order to drive potential consumers (i.e., DIAMOND's customers with whom DIAMOND has a valid, enforceable contract) to Defendants' timeshare exit 'law firm', Defendants have undertaken the intentional infringement of the Diamond Marks.

41.     To accomplish this, Defendants have engaged in, *inter alia*, a scheme of Search Engine Optimization ("SEO") that includes, but is not limited to, the following:

    a.  purchasing numerous Google AdWords® keywords[2] on the internet that incorporate and utilize the Diamond Marks, including, but not limited to, the following:

        i.  "cancel diamond resorts membership;"

        ii.  "diamond resorts scams;"

        iii.  "diamond resorts scam;"

        iv.  "cancel diamond resorts timeshare;"

        v.  "cancel diamond resorts;"

---

[2] 'Keywords' are the specific words used to trigger the display of an advertisement on Google's search results if the advertiser has agreed to pay enough to display their ad.

      vi.   "cancel diamond timeshare;"

     vii.   "diamond resorts class action lawsuit;"

   viii.   "how to get out of diamond resorts;"

     ix.   "diamond resorts international problems;"

      x.   "diamond resorts international complaints;" and

     xi.   "how to cancel diamond resorts membership."

b.  purchasing numerous AdWords® on the internet that incorporate and utilize the Diamond Marks, which AdWords® relate to various DIAMOND branded properties without anything more, such as, but not limited to:

       i.   "diamond resorts arizona;"

      ii.   "diamond resorts branson missouri;"

     iii.   "diamond resorts international lake tahoe;"

     iv.   "daily mirror diamond resorts;" and

      v.   "diamond timeshare."

c.  use of metatags and other embedded coding and wording, utilizing DIAMOND's intellectual property, to further drive Defendants' advertising to the top of search engine results when consumers utilize searches including any of DIAMOND's intellectual property.[3]

42.    Defendants have, at varying times, also included direct references to Diamond on its website, including, without limitation, alleged evidence of the 'success' of its 'process' in 'exiting' consumers from their timeshare contracts.

---

[3] Metatags and embedded coding and wording are akin to 'invisible ink' – they are the code that a consumer's web browser downloads and executes in order to display a webpage on the consumer's computer screen. While invisible to the consumer, they are used by the consumer's computer and by search engines, such as Google, in determining how to rank webpages in search results and in the process of awarding AdWords® advertisements.

43.     In addition, Defendants also purchase AdWords® utilizing the Diamond Marks to advertise services Defendants specifically disclaim they actually provide.  For example, and not by way of limitation, Defendants have purchased AdWords® for "how to sell diamond resort timeshare," "diamond timeshares for sale," and "how do I sell my diamond resorts timeshare," amongst others.  Yet, during a call with potential customers, USCA specifically stated that it does not actually resell, sell, or broker timeshare properties.  A copy of a transcription of this call is annexed hereto as Exhibit 4.

44.     Defendants purchase an extraordinary amount of AdWords®.  By way of comparison, an analysis by DIAMOND shows that there are a global total of 3,963 total AdWord® keywords purchased by USCA and DIAMOND.  Of these 3,963 keywords, 24 are purchased by both DIAMOND and USCA, DIAMOND purchased 437 unique keywords, and USCA purchased 3,502 unique keywords.  Overall, Defendants have created at least 1,348 combinations of advertisements and AdWord® keywords, including for keywords and ads that are wholly unrelated to Defendants' alleged business, such as:

    a.  "No More Paying Timeshare Fees – Get Out of your Timeshare" when consumers search for 'timeshare blog;'

    b.  "Forced & Tricked in[sic] Buying a Timeshare & Want Out?  See Our Quick & Easy Process" when consumers search for 'diamond resorts arizona' or 'diamond resorts international lake tahoe'; and

    c.  "Scammed Into a Timeshare? – Exit Your Timeshare Contract" when consumers search for 'diamond resorts branson missouri.'

45.     Upon information and belief, all of the foregoing actions are taken by Defendants in order to create the 'aura' that they are somehow affiliated with, endorsed by, sponsored by, or

has some type of special relationship with DIAMOND. There is simply no reason for Defendants' advertisements to consumers who, for example, are searching for DIAMOND properties in Arizona – a search having nothing to do with canceling or 'exiting' timeshare contracts – other than to create the impression of some type of affiliation, endorsement, or sponsorship by or with DIAMOND. Defendants, in fact, have no affiliation with, endorsement by, sponsorship from, or special relationship with DIAMOND.

46.     Moreover, the advertisements and statements made by Defendants are false or misleading. For example, there is no guaranteed process for 'safely' exiting a timeshare contract other than foreclosure of the timeshare interest or utilization of a program offered by DIAMOND, not Defendants.

47.     Defendants have also created a network of passive websites that are apparently designed solely to 'squelch' bad reviews of Defendants, or otherwise make it difficult for consumers to find negative reviews or 'tell alls' of Defendants and their schemes. By way of example, and not limitation, Defendants have apparently created at least the following websites with no purpose other than to engage in Search Engine Optimization and hide negative reviews of USCA, Portner, and Sussman:

     a.   usconsumerattorneysreviews.blogspot.in;

     b.   sites.google.com/site/usconsumerattorneyscomplaints/home;

     c.   usconsumerattorneysfalsenegativereviews.weebly.com;

     d.   issu.com/usconsumerattorneys;

     e.   usconsumerattorneysfalsenegativereviews.wordpress.com;

     f.   usconsumerattorneysfalsecomplaints.blogspot.in;

     g.   usconsumerattorneysreviews.wordpress.com;

    h.   www.slidehsare.net/henryportner/henry-n-portner-the-noteworthy-attorney-in-florida-lake-worth;

    i.   nevadanationaladvertising.wordpress.com;

    j.   aboutus.com/Nevada-National-Advertising;

    k.   nevada-national-advertising.blogspot.com;

    l.   slideshare.net/Nevada-National-Advertising;

    m.  about.me/nevada.national.advertising;

    n.   smore.com/u/nevadanationaladvertising; and

    o.   nevadanationaladvertising.brandyourself.com (collectively the "Passive Websites").

48.    The Passive Websites collectively make a number of false and misleading statements about USCA, Portner, and Sussman, such as (without limitation) that they have excellent reputations (they do not), that Portner was wrongly accused of misconduct (he has, in fact, been publicly reprimanded by the Florida Bar twice and by the United States Patent and Trademark Office once), that Portner is a member of the United States Patent and Trademark Office (he is not), and that anyone that accuses USCA, Portner, and/or Sussman of improper or unethical conduct is simply jealous of their success.

49.    All of the foregoing (including, without limitation, the false advertising engaged in through the use of AdWords® and other means) creates the false impression that Defendants, through a special relationship with DIAMOND or other means, have a special or unique ability to help consumers exit their timeshare contracts with Diamond without any harm to the consumers.  This is, in fact, false.  Not only is there no special relationship between Defendants and DIAMOND, there is, in fact, no special means or technique for helping timeshare customers

exit their timeshare contracts unharmed.  In reality, timeshare contracts are legally binding, valid contracts and Defendants have no special or unique means or method for helping consumers exit their timeshare contracts (as opposed to DIAMOND, which does maintain a special program for this very purpose, and which Defendants specifically direct eligible consumers away from). What Defendants do, in fact, is charge consumers exorbitant sums of money, then, in most instances, do little or nothing other than attempt to force a default of the timeshare contract on the part of the consumer, causing DIAMOND to foreclose that timeshare interest, causing substantial harm to the consumer.  Defendants never disclose any of the foregoing to the consuming public and, instead, all of their advertising actions described above are designed to give the opposite impression, mislead the consuming public, and prevent consumers from knowing the truth.

50.    Upon information and belief, Defendants work with or otherwise have a relationship with other third-party entities to carry out its schemes.  By way of illustration, and not limitation, upon information and belief, Defendants work with an entity known as 'Newton Group Transfers' to attempt to sell, transfer, or otherwise dispose of timeshare interests. Defendants engage in this behavior despite specifically assuring consumers, including DIAMOND's customers, that they do not sell timeshare interests.

51.    Defendants never provide a disclaimer that it is not sponsored by, endorsed by, affiliated with, or approved by DIAMOND, or that they are not, in some other way, related to DIAMOND.

52.    The scope and scale of the AdWord® purchases, as well as Defendants' other passive advertising techniques, go well beyond the use of the Diamond Marks necessary to describe Defendants' services.

53. The scope and scale of the AdWord® purchases go well beyond the use of the Diamond Marks to describe DIAMOND's products and services and, in fact, are frequently misleading to consumers.

54. Many of the AdWord® ads purchased by Defendants, and the content on Defendants' website, is false and/or misleading, either literally or implicitly.

55. By engaging in the foregoing actions, Defendants have intentionally used DIAMOND's intellectual property, including the Diamond Marks, to divert consumers from DIAMOND and, *inter alia*, programs it has for consumers, and funneled those consumers to Defendant.

56. Ultimately, Defendants are damaging the DIAMOND brand for their own benefit while simultaneously harming consumers by deceiving them.  DIAMOND is instituting this action to shield themselves from Defendants' wrongful actions, by halting Defendants and their predatory industry from destroying the valuable goodwill that DIAMOND enjoys with its customers and in their intellectual property rights.  DIAMOND seeks to ensure that Defendants are prohibited from causing further monetary and reputational damages, by taking advantage of DIAMOND's customers, and the general public, by charging exorbitant fees for illusory and unnecessary "services" and through Defendants' false and misleading advertising.

## COUNT I
### Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) – False Advertising

57. DIAMOND adopts and realleges paragraphs 1 through 56 above as if fully set forth herein.

58. This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), specifically, false advertising.

59.     Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The statements described above and incorporated herein were literally false, either on their face or by necessary implication.

60.     The representations described above were commercial speech made by a defendant acting in competition to DIAMOND by trying to interfere with DIAMOND's business relationships for Defendants' own ill-gotten financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

61.     Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

62.     Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services, whether to cease making payments to DIAMOND, whether to attempt to terminate the contractual relationship(S) with DIAMOND, and/or whether to utilize any program or remedy offered by DIAMOND.

63.     DIAMOND has been or is likely to be injured as a result of Defendants' false statements.

64.     DIAMOND demands both injunctive and monetary relief as set forth by the Lanham Act. *See* 15 U.S.C. §§ 1116 – 1117.

WHEREFORE, DIAMOND seeks:

a.     a temporary and a permanent order enjoining Defendants from unauthorized use of the Diamond Marks and any false or misleading advertising;

b.      damages, including, without limitation, exemplary damages and/or treble

damages;

c.      attorneys' fees; and

d.      any and all other relief this Court deems appropriate.

## COUNT II
## Unfair Competition under the Lanham Act

65.      DIAMOND adopts and realleges paragraphs 1 through 56 above as if fully set forth herein.

66.      This is a cause of action for unfair competition under the Lanham Act.

67.      Defendants' use in commerce of a mark that is the same and/or confusingly similar to the Diamond Marks in connection with Defendants' goods and services constitutes a false designation of origin and/or a false or misleading description or representation of fact, which is likely to cause confusion, cause mistake, or deceive as to affiliation, connection, or association with DIAMOND, or as to the origin, sponsorship, or approval of Defendants' goods and services or commercial activities by DIAMOND.

68.      Defendants' use in commerce of the Diamond Marks and/or marks confusingly similar thereto with the knowledge that DIAMOND owns and has used, and continues to use, its trademarks constitutes intentional conduct by Defendants to make false designations of origin and false descriptions about Defendants' activities.

69.      As a direct and proximate result of such unfair competition, DIAMOND has suffered, and will continue to suffer, monetary loss and irreparable injury to its business, reputation, and goodwill.

WHEREFORE, DIAMOND seeks:

     a.     a temporary and a permanent order enjoining Defendants from unauthorized use of the Diamond Marks pursuant to 15 U.S.C. § 1116;

     b.     treble damages pursuant to 15 U.S.C. § 1117, or statutory damages pursuant to 15 U.S.C. § 1117;

     c.     attorneys' fees pursuant to 15 U.S.C. § 1117; and

     d.     any and all other relief this Court deems appropriate.

**COUNT III**
**Common Law Unfair Competition**

70.     DIAMOND adopts and realleges paragraphs 1 through 56 above as if fully set forth herein.

71.     This is a cause of action for unfair competition existing under the common law.

72.     By virtue of having used and continuing to use the Diamond Marks, DIAMOND has acquired common law trademark rights in the Diamond Marks.

73.     Defendants' use of marks that are the same as and/or confusingly similar to the Diamond Marks infringes DIAMOND's common law trademark rights in its Diamond Marks and is likely to cause confusion, mistake, or deception among consumers who will believe that Defendants' activities originate from, are affiliated with, or are endorsed by DIAMOND when, in fact, they are not.

74.     Defendants have been and are being unjustly enriched by their wrongful misappropriation of the Diamond Marks and/or a mark confusingly similar thereto.

75.     As a direct and proximate result of such unfair competition, DIAMOND has suffered, and will continue to suffer, monetary loss and irreparable injury to its business, reputation, and goodwill.

WHEREFORE, DIAMOND seeks:

a.      a temporary and a permanent order enjoining Defendants from unauthorized use of the Diamond Mark;

b.      damages; and

c.      any and all other relief this Court deems appropriate.

**COUNT IV**
**Trademark Dilution Under the Lanham Act**

76.      DIAMOND adopts and realleges paragraphs 1 through 56 above as if fully set forth herein.

77.      This is a cause of action for trademark dilution.

78.      The Diamond Marks are famous and distinctive.

79.      The Diamond Marks have been used in commerce by DIAMOND.

80.      Defendants have inappropriately used the Diamond Marks or marks confusingly similar thereto in commerce.

81.      Defendants' actions have blurred the famous Diamond Marks.

82.      Defendants' actions have tarnished the famous Diamond Marks.

83.      Defendants' inappropriate use of the Diamond Marks, or marks confusingly similar thereto, occurred after the Diamond Marks became famous.

84.      Defendants' inappropriate use of the Diamond Marks, or marks confusingly similar thereto, is likely to cause dilution of the Diamond Marks distinctive quality through blurring and/or tarnishment.

WHEREFORE, DIAMOND seeks:

a.      a temporary and a permanent order enjoining Defendants from unauthorized use of the Diamond Marks;

b.      damages; and

       c.      any and all other relief this Court deems appropriate.

**COUNT V**
**<u>Tortious Interference</u>**

79.    DIAMOND adopts and realleges paragraphs 1 through 56 above as if fully set forth herein.

80.    This is a cause of action for tortious interference with advantageous business relationships.

81.    There exists between DIAMOND and its customers a valid business relationship.

82.    Defendants have knowledge of the existence of the business relationship between DIAMOND and its customers and specifically targets those customers with its false and/or misleading advertising.  Upon information and belief, if DIAMOND's customers knew the truth about how Defendants' actions would adversely impact them, many would not cancel (through breach resulting in foreclosure or otherwise) their timeshare contracts.

83.    Defendants intentionally, and unjustifiably, interfere in the relationships between DIAMOND and its customers by wrongfully inducing the customers to breach their valid and binding contractual obligations with DIAMOND by making false promises, through false advertising, and through false inducements.  Defendants induce Diamond's customers to breach their agreements with DIAMOND and/or to withdraw from their business relationship with DIAMOND altogether.

84.    As a result of Defendants' conduct, DIAMOND has suffered damages.

WHEREFORE, DIAMOND seeks:

       a.      damages; and

       b.      any and all other relief this Court deems appropriate.

Dated: June 18, 2018.

/s/Daniel J. Barsky
**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: 561-650-8518
Facsimile: 561-822-5527
*Attorneys for Plaintiffs*

and

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone:  (407) 835-6755
Facsimile:  (407) 849-7255
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF this 18th day of June, 2018, which caused a copy to be served via email on the following: *Henry N. Portner, Esq.,* 6586 Hypoluxo Road, Suite 300, Lake Worth, Florida 33467, email: PortnerLitigation@hotmail.com; and that Plaintiffs will cause a copy of the foregoing Amended Complaint to be served via process or other proper means upon the remaining defendants.

/s/ Daniel J. Barsky
Daniel J. Barsky, Esq.

ORLDOCS 16206751 1 43508.0032

- 26 -