**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
Fort Pierce Division
Case No.: 9:18-cv-80311-ROSENBERG/REINHART

DIAMOND RESORTS INTERNATIONAL, INC., a Delaware corporation; DIAMOND RESORTS CORPORATION, a Maryland corporation, DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, a Delaware limited liability company; and DIAMOND RESORTS MANAGEMENT, INC., an Arizona corporation,

       Plaintiffs,

v.

US CONSUMER ATTORNEYS, P.A., a Florida professional corporation; HENRY PORTNER, ESQ. an individual; ROBERT SUSSMAN, an individual; PLUTO MARKETING INC., a Nevada corporation; 1PLANETMEDIA INC, a Nevada corporation; JOHN DOES #1-50; NEWTON GROUP TRANSFERS, LLC, a Michigan limited liability company; THE NEWTON GROUP, ESA LLC, a Michigan limited liability company; INTERVAL BROKER DIRECT, LLC, a Michigan limited liability company; NEWTON GROUP EXIT, LLC, a Florida limited liability company; and DC CAPITAL LAW FIRM, LLP, a Washington D.C. limited liability partnership,

       Defendants.

## SECOND AMENDED COMPLAINT

Plaintiffs, Diamond Resorts International, Inc.; Diamond Resorts Corporation; Diamond Resorts U.S. Collection Development, LLC; and Diamond Resorts Management, Inc. (collectively, "Plaintiffs" or "Diamond"), by and through their counsel of record, sue Defendants

US Consumer Attorneys, P.A. ("USCA"); Henry Portner, Esq. ("Portner"); Robert Sussman ("Sussman"); Pluto Marketing Inc. ("Pluto"); 1Planetmedia Inc. ("1 Planet"); John Does #1-50 (USCA, Portner, Sussman, Pluto, 1 Planet, and John Does #1-50 may sometimes hereinafter be collectively referred to as the "USCA Defendants"); Newton Group Transfers, LLC ("Newton Group"); The Newton Group, ESA LLC ("Newton ESA"); Interval Broker Direct, LLC ("IBD"); Newton Group Exit, LLC ("Newton Exit") (Newton Group, Newton ESA, IBD, and Newton Exit may sometimes hereinafter be collectively referred to as the "Newton Defendants"); and DC Capital Law Firm, LLP ("DC Law") (all of the foregoing, collectively, the "Defendants"), and state as follows:

A.      **Subject Matter and Personal Jurisdiction, and Venue**

1.      This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. §§ 1331 and 1338(a) with respect to the causes of action arising under the Lanham Act.  The Court has supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to claims in this civil action within the Court's original jurisdiction that they form part of the same case or controversy and same common core of operative facts.

2.      USCA is a professional corporation organized and existing under the laws of the state of Florida with an alleged principal address at 6586 Hypoluxo Road, Suite 300, Lake Worth, Florida 33467.  This Court therefore has personal jurisdiction over USCA.  In reality, USCA's main office is located at 1300 North Johnson Avenue, Suite 107, El Cajon, California 92020 in the same office as at least co-defendants Pluto and 1 Planet.

3.      Portner is an individual and an attorney licensed to practice law in multiple jurisdictions, including the state of Florida under Florida Bar Number 883050.  Portner is,

allegedly, the principal and sole law partner of USCA and lists his official mailing address with The Florida Bar as being the mailing address for USCA (6586 Hypoluxo Road, Suite 300, Lake Worth, Florida 33467).  Portner is a resident of the state of Florida and Palm Beach County, Florida, as he maintains a home address at 6316 Vireo Court, Lake Worth, Florida 33463. Portner has claimed, and continues to claim, the Florida Homestead Exemption for the property located at 6316 Vireo Court.

4.      Sussman is an individual who holds himself out as the manager of USCA. Sussman owns a home located at 1744 Eldon Court, El Cajon, California 92020.

5.      Pluto is a corporation organized and existing under the laws of the state of Nevada.  Pluto has represented to the Nevada Secretary of State that its principal address is 7065 West Ann Rd., Suite 130-165, Las Vegas, Nevada 89130.  However, according to Google® Maps, 7065 West Ann Rd., Suite 130 is a store operated under the name 'The UPS Store', which provides, *inter alia*, mailbox services.  On information and belief, Suite 130-165 indicates that Pluto merely rents a mailbox at The UPS Store and that this address is not its actual place of business.  Pluto, under the direction and control of Sussman, has registered and/or used numerous domain names including <timesharefighter.com>, <tsrsonline.com>, <bestresortrentalandsale.com>, <dumpyourtimesharenow.com>, <timesharefighter.com>, <timeshareresalesource.com>, and <uscalaw.com>, which it has utilized in connection with the actions taken by Defendants, in concert, as more fully described below.

6.      1 Planet is a corporation organized and existing under the laws of the state of Nevada.  1 Planet represents to the Nevada Secretary of State that its principal address is 7065 West Ann Rd., Suite 130-165, Las Vegas, Nevada 89130.  This is the same address used by Pluto.  In reality, 1 Planet's actual business address is 1300 North Johnson Avenue, Suite 107, El

Cajon, California 92020, the same address utilized by USCA.  1 Planet is a marketing company that engages in nationwide advertising activities including, *inter alia*, marketing to consumers in the State of Florida.  Additionally, 1 Planet utilizes its merchant accounts to process payments on behalf of USCA and pay a portion of those payments back to marketing or other companies that referred consumers to USCA.  Thus, USCA is co-mingling client funds with 1 Planet and splitting those fees with yet other, non-lawyer entities.

7.      John Does #1-40 are presently unknown affiliates and/or subsidiaries of 1 Planet. As detailed further below, Sussman (along with Portner) engages in substantial deceptive online advertising in order to 'downrank' or otherwise bury or hide damaging stories about them.  Many of these marketing campaigns include YouTube videos that appear to be PowerPoint presentations.  Some of these presentations are also maintained on the website issuu.com ("Issuu"), which "gives anyone with digitally bound content the ability to upload and distribute their publications worldwide."[1]      One such presentation is located at https://issuu.com/robertsussman/docs/renting_and_selling_a_timeshare_mad.  The sixth slide of the presentation located at that website states, in part, "[t]he 1 Planet Media experts operate on the network with an adequate mix of Internet Marketing, with 40 subsidiaries, and many websites."  John Does #1-40 are these 40 subsidiaries advertised by Sussman's Issuu account as working with 1 Planet to engage in the activities described hereinbelow.  The true identities of these 40 subsidiaries are unknown and cannot reasonably be determined at this time without the use of the Court's subpoena power.

8.      Similarly, John Does #41-50 are the "many websites" advertised on Sussman's Issuu account as working with 1 Planet to engage in the activities described herein below.  The

---

[1] https://issuu.com/about (last accessed Aug. 31, 2018).

true identities of these "many websites" are unknown and cannot reasonably be determined at this time without the use of the Court's subpoena power.

9.      Newton Group is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal address located at 250 Monroe Avenue NW, Suite 400 PMB #6026, Grand Rapids, Michigan 49503.  In reality, Newton Group operates out of facilities located at 1750 E Northrop Boulevard, Suite 170, Chandler, Arizona 85286.

10.     Newton ESA is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal address located at 3148 Plainfield Avenue NE, Suite 283, Grand Rapids, Michigan 49525.

11.     IBD is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal address located at 250 Monroe Avenue NW, Suite 400 PMB #6026, Grand Rapids, Michigan 49503.

12.     Newton Exit is a limited liability company organized and existing under the laws of the state of Florida with an alleged principal address located at 218C East New York Avenue, Deland, Florida 32724.  This is an obviously fake address as the address appears to be occupied by an engineering firm named CHA.  Newton Exit can be found via its manager, UNL Holdings, LLC, which is affiliated with the other Newton Defendants and can be found at the same location as Newton ESA: 3148 Plainfield Avenue NE, Suite 283, Grand Rapids, Michigan 49525, the mailing address of UNL Holdings, LLC.

13.     DC Law is a limited liability partnership organized and existing under the laws of the District of Columbia, with a principal address located at 700 12th Street NW, Suite 700, Washington, D.C. 20005

14.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 as many of the Defendants are located in this district or the actions and inactions that occurred or did not occur that are complained about herein occurred in, or were directed in or from, the Southern District of Florida and/or Defendants repeatedly used the mails and wires to solicit consumers in the State of Florida and direct false demand letters and other correspondence to Diamond and the consuming public in Florida.

**B.     <u>Diamond</u>**

15.     Diamond is a global leader in the hospitality and vacation ownership industries.

16.     Diamond strives to provide innovations and flexibility to ensure that Diamond members and owners create their dream vacation, providing an increased sense of happiness and satisfaction in their lives, while feeling healthier and more fulfilled in their relationships, by enjoying memorable and meaningful experiences.

17.     Plaintiff Diamond Resorts International, Inc. ("DRI") is a Delaware corporation with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  DRI consists of, amongst others, interests in vacation ownership resorts.  DRI's indirect subsidiaries – including Diamond Resorts US Collection Development, LLC ("US Collection") – offer vacation ownership programs wherein members acquire vacation ownership interests in the form of points that owners can then use to stay at various destinations.  In sum, DRI is a holding company and its principal asset is the ownership of equity interests in its direct and indirect subsidiaries, including those identified herein.  DRI is the parent company of Diamond Resorts Holdings, LLC ("DRH").

18.     DRH is similarly a holding company and the parent company of Diamond Resorts Corporation ("DRC").

19.     Plaintiff, DRC, is a Maryland corporation with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  DRC is the parent company or ultimate parent company of several entities that conduct timeshare sales, exchange, management, and development activities throughout the United States and worldwide. DRC and its subsidiaries develop, own, operate, and manage vacation membership resorts, and through resort and partner affiliations, provide members and guests with access to managed resorts, affiliated resorts and cruise itineraries.  DRC is the 100% owner of multiple underlying Diamond development entities, each of which is registered in the states wherein they do business, such development entities providing timeshare interests. These development entities are the contracting parties to purchase agreements with Diamond timeshare owners for deeded timeshare interests and/or timeshare interests in the form of points.  As part of the purchase of the timeshare interest, owners are also required to pay maintenance fees and annual assessments. Because DRC is the 100% owner of the development entities it ultimately subsumes all the losses of its underlying development entities, and therefore, all of the damages, both current and future, as a result of litigation are encapsulated within DRC.

20.     Plaintiff US Collection, as explained below, is an indirect wholly-owned subsidiary of DRI and direct subsidiary of DRC.

21.     Plaintiff US Collection is a Delaware limited liability company with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  The sole member of US Collection is Diamond Resorts Developer and Sales Holding Company, a Delaware corporation with its principal place of business at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  US Collection sells membership interests to consumers in the form of points, which, in turn, are exchanged for use of properties, including properties located in

Florida, in the Diamond Resorts US Collection, a non-specific multi-site timeshare plan. In addition to its sales functions, US Collection may finance the purchase of membership interests for consumers.

22. US Collection is the contracting party, through valid and binding contracts, with Diamond timeshare owners (the "Diamond Owners") to purchase timeshare interests in the form of points (the "Timeshare Contracts"). As part of the purchase of the timeshare interest, owners are also required to pay maintenance fees and annual assessments. The Timeshare Contracts control the benefits and obligations of timeshare ownership between the Diamond Owners and Diamond.

23. Plaintiff, Diamond Resorts Management, Inc. ("Diamond Management"), is another indirect subsidiary of DRI. Diamond Management is an Arizona corporation, registered to do business in the state of Florida, with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. By way of contractual agreement, the various Diamond subsidiaries and affiliated entities have delegated their management powers and rights to Diamond Management exclusively. The management services delegated to Diamond Management include, but are not limited to, the billing and collection of maintenance and annual fees from timeshare interests.

24. Diamond Management maintains rights and interests in the maintenance and annual fees on behalf of the home owners associations, which are impacted by Defendants' conduct. As such, Diamond Management is a real party in interest and has standing to prosecute the claims herein.

25. Diamond is concerned not only for its own economic well-being, but for the well-being of Diamond Owners who have been defrauded by Defendants' wrongful conduct.

26.     Diamond institutes this action to redress the Defendants' illegal actions and damages suffered by Diamond, and to deter future wrongful conduct against Diamond and Diamond Owners.

27.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

28.     Diamond has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 35 U.S.C. § 1117 and other statutes, as set forth in greater detail herein.

**C.      Overview of the Complaint and Diamond's Causes of Action**

29.     Recently, a nefarious cottage industry known as "timeshare exit" has sprouted. This industry preys upon unsuspecting timeshare owners, including Diamond Owners, inducing them into breaching their binding Timeshare Contracts, causing both the consumers and timeshare developers, like Diamond, grave harm.

30.     Some timeshare exit companies, including USCA (and Portner and Sussman, who direct and control USCA), and Newton Group and Newton ESA, fail to inform consumers that by utilizing the timeshare exit company's methods, the consumers actually breach and default on their timeshare contracts and thereby suffer substantial harm to their finances and credit.

31.     Timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with damaged or ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare

developer, such as Diamond, directly or utilizing one of the many programs created by Diamond for consumers, such as the Diamond Transitions® program.

32.     Defendants, each individually and together, engage in, and/or accept the benefits of, extensive false advertising, make untrue statements and misleading promises, and guarantee success or specific results that they cannot – and do not – deliver to unsuspecting timeshare owners (including Diamond Owners), all the while surreptitiously extracting exorbitant, unwarranted fees for illusory services – fees that otherwise would have been used to pay Diamond for amounts legitimately owed to Diamond pursuant to the Timeshare Contracts.

33.     Defendants, acting both separately and in concert (as further detailed hereinbelow), have engaged in various scams to take advantage of Diamond Owners and cause Diamond millions of dollars in damages.  Each Defendant plays a specific role necessary to effectuate and complete the scams.   Together, Defendants purposefully act, using shell companies and websites, as well as lawyers and sham law firms (sometimes controlled by non-lawyers) improperly related to non-lawyer 'marketing' firms, to divert, or to otherwise hide and abscond with, funds from Diamond Owners (diverting those funds from Diamond), and interfere with the current and prospective contractual relationships between Diamond Owners and Diamond.

34.     A diagram showing how the Defendants are affiliated and interact with each other is annexed hereto as Exhibit 1.

35.     Defendants are not parties to the Timeshare Contracts.  Yet they falsely advertise a "cancellation", "exit", or "transfer" service that purports to "legally" release or "exit" Diamond Owners from the obligations of their Timeshare Contracts.  The following is an example advertisement by the USCA Defendants for illustrative purposes:

- 10 -

⊟ What is the timeshare rescission service?

> The timeshare termination service is the process of legally cancelling your resort membership and eliminating all the annual maintenance expenses as well. This process enables the timeshare disposal so owners are completely free from their timeshare resort ownership – permanently. Clients will be assigned a timeshare attorney who will assist in the timeshare termination process or timeshare rescission of agreement is completed.

As set forth in greater detail in this Second Amended Complaint, the USCA Defendants do not possess a 'legal process' of 'permanently' terminating a Diamond Owner's Timeshare Contract and this advertisement is therefore false and/or misleading.

36.    The following is a representative advertisement utilized by the Newton Defendants:

> We are attempting to contact you because our records suggest that you are an owner who may be affected by new Timeshare Laws allowing developers to raise maintenance fees with no restriction. These new laws may also make it more difficult for owners such as yourself to get rid of your timeshare.
>
> Let us help.

There is no such law; this advertisement (and its implication that maintenance fees will increase dramatically) is completely false and misleading.  Moreover, any new timeshare laws (such as the revisions to Chapter 721, Florida Statutes), are designed to make it illegal for Defendants to operate their schemes; thus, to the extent that any "new laws may also make it more difficult for owners…to get rid of [their] timeshare", this statement is false and/or misleading because it could only be true by virtue of the shuttering of illegal scams, such as the Newton Defendants' scam.

37.    Defendants even guarantee results – that is, Defendants guarantee that Diamond Owners will be legally and permanently exited from their Timeshare Contracts if they use Defendants' services.  Guarantees of this nature violate the Florida Bar Rules of Professional

Conduct.[2]  While USCA does engage in such advertisement, other law firms (in this case, DC Law) do not and thus rely upon the non-attorney, non-law firm defendants (specifically, the Newton Defendants) to publish such advertisements and then refer any 'clients' to DC Law.

38.     Through these false and misleading advertisements, Defendants individually and collectively deceive hundreds (or more) of Diamond Owners into retaining Defendants, including the attorneys at USCA (including Portner) and DC Law, at substantial cost, to implement Defendants' purported "cancellation" or "transfer" services related to their Timeshare Contracts.

39.     The USCA Defendants collectively engage in the advertising attributed to them in this Second Amended Complaint.  The Newton Defendants collectively engage in the advertising attributed to them in this Second Amended Complaint.  DC Law does not engage in any readily apparent advertising, but accepts the benefits of the false and/or misleading advertising engaged in by the Newton Defendants and, potentially, other third-parties.

40.     Unfortunately for these Diamond Owners, the "services" Defendants sell typically results in an outcome very different than what Defendants promise.

41.     Upon being hired, Defendants instruct, deceive, induce, or persuade Diamond Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, as a means of facilitating the "exit", "cancellation", or "transfer".  In fact, Defendants advise Diamond Owners to stop making payments to Diamond in order to justify their fees (that is, Defendants redirect monies that are contractually owed to Diamond to themselves).

---

[2] Rule 4-7.13(b), Florida Rules of Professional Conduct, states, "Deceptive or inherently misleading advertisements include, but are not limited to advertisements that contain: (1) statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results; . . . ."

42.     Defendants do not disclose to the Diamond Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will actually result in an unlawful breach of the Timeshare Contracts due to non-payment, leading to a foreclosure or cancellation due to default of their timeshare interests.  Additionally, none of the Defendants disclose to the Diamond Owners that Defendants may do nothing but take thousands of dollars from a Diamond Owner and enroll that Diamond Owner in Transitions®, a step the Diamond Owner could have taken for a nominal fee.

43.     Nevertheless, after the Timeshare Contracts are foreclosed, Defendants then misrepresent to these former Diamond Owners that they were successful in "cancelling" or "exiting" their Timeshare Contracts.

44.     Alternatively, Defendants may negotiate a surrender or deed-in-lieu on behalf of Diamond Owners, while failing to inform the Diamond Owners that doing so also has substantial negative impacts on the credit and finances of Diamond Owners.

45.     Cancellation due to rescission of a contract is very different in nature than a breach and cancellation due to default.  But Defendants advertise the former only to mislead Diamond Owners into the latter.

46.     Under the Florida Statutes, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Diamond Owners that can be exercised within a certain time period following the execution of a Timeshare Contract.  *See* Fla. Stat. § 721.10.  It is not a service that can be advertised, sold, or provided in commerce.

47.     Additionally, the Florida Vacation Plan and Timesharing Act specifically prohibits using fraudulent transfers to transfer a timeshare interest from an owner (such as a Diamond Owner) to a third-party purchaser who will not make payments on the timeshare

interest, thus resulting in a foreclosure.  *See* Fla. Stat. § 721.17.  This is known as a "Viking Ship".

48.     Defendants mislead Diamond Owners into purchasing illusory "cancellation" or "transfer" services and thereby cause and induce the breaches of hundreds of Timeshare Contracts.

49.     Ultimately, not only are Diamond's relationships with the Diamond Owners irreparably damaged, the developers, like Diamond, are dramatically financially impacted by the loss of millions of dollars in contract-based revenue.

50.     As for the Diamond Owners, they lose their timeshare interests through foreclosure (even if they have fully paid the principal toward timeshare ownership) or deed-in-lieu transfers and suffer significant negative impact on their credit.

51.     Defendants act individually and together to form one such TPE scam, as set forth in greater detail herein and shown in Exhibit 1.

52.     Diamond has no other option but to actively and aggressively seek justice for itself, as well as injunctive relief to thwart Defendants from inflicting further and ongoing damage to Diamond's business and, most importantly, its relationships with Diamond Owners.

53.     In pursuing its legal and equitable remedies here, Diamond is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Further, as a concomitant effect, Diamond is also protecting from further harm the Diamond Owners, and timeshare owners at large, who have been negatively impacted by Defendants' wrongful conduct, and otherwise positively impacting the timeshare industry.

54.     This Second Amended Complaint requests damages and injunctive relief for false advertising and contributory false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) and under the causes of action for a defendant making false and/or misleading representations about its own goods or services (authorized by *Pom Wonderful, LLC v. Coca-Cola Co.* 573 U.S. 102 (2014) and *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)), intentional interference with contractual relations, civil conspiracy, and violations of the Florida Deceptive and Unfair Trade Practices Act.

55.     In sum, the Timeshare Contracts at issue are legally binding, valid contracts. What Defendants do by charging Diamond Owners exorbitant sums of money, then, in most instances, doing little or nothing other than convince Diamond Owners to default on the Timeshare Contracts, causes substantial harm to these Diamond Owners and to Diamond. Defendants never disclose any of the foregoing to the consuming public and, instead, all of their advertising actions described in this Second Amended Complaint are designed to give the opposite impression, mislead the consuming public, and prevent consumers from knowing the truth.  The foregoing is either accomplished directly (by the USCA Defendants and the Newton Defendants) or indirectly (by the Newton Defendants referring Diamond Owners to the USCA Defendants and/or DC Law).

56.     US Collection is damaged by Defendants' tortious and illegal conduct. When the Defendants wrongfully convince Diamond Owners to breach their contracts with Plaintiffs, these Diamond Owners cease making financing payments to US Collection, thus negatively impacting US Collection's revenue.

57.     DRI is damaged by Defendants' tortious and illegal conduct because Defendants' entire business model is premised on drawing customers away from Diamond and diverting

Diamond Owner's funds from Diamond to Defendants.   Because the losses resulting from Defendants' tortious conduct are reflected on DRI's financial statements, DRI ultimately suffers financial harm as a direct result of Defendants' illegal conduct.

**D.      The USCA Defendants**

58.      USCA bills itself, and is apparently organized as, a law firm.   But USCA is apparently managed and/or run, at least in part, by Sussman, a non-lawyer, and is directly linked with Pluto and 1 Planet, non-law firm entities that advertise on behalf of USCA, own various USCA-linked assets, and refer clients to a group of captive lawyers, purportedly working at USCA, such as Portner.   USCA is co-located with Sussman's marketing companies (1 Planet and Pluto) and potentially their subsidiary entities (John Does #1-50).

59.      More specifically, the USCA Defendants engage in a number of practices that appear to be incompatible with a law firm, and that are false and/or deceptively misleading, such as:

a.  offering guaranteed results (*see* Exhibit 2 annexed hereto);

b.  running advertisements that have, upon information and belief, not been submitted to The Florida Bar (*see id.*);

c.  failing to disclose a 'home office' and locations where services are rendered;

d.  not disclosing who their attorneys are and telling consumers that they will simply be assigned an 'experienced timeshare attorney' with a hyperlink that redirects consumers to USCA's homepage, www.usconsumerattorneys.com (*see* Exhibit 3 annexed hereto);

e.  claiming as 'our lawsuits' civil actions that were filed, apparently, by law firms other than USCA, such as Case No. A-17-762690-C, currently pending in the United States District Court for the District of Nevada;

f.  utilizing strawmen and other companies (such as Sussman, Pluto, 1 Planet, and John Does #1-50) to engage in advertising activities;

g.  allowing non-attorneys to exert managerial control and force over USCA, specifically Sussman;

h.  accepting referrals from third-parties, including American Resource Management Group, LLC ("ARMG"), which engage in a variety of activities that would be illegal or improper for a law firm to engage in, such as using USCA's and 1 Planet's merchant accounts to process payments for consumers who contracted with ARMG and then paying back to ARMG a portion of the funds taken from those consumers;

i.  failing to maintain proper accounting records and financial controls, such as proper trust accounts, improperly co-mingling client funds, and immediately claiming as 'earned' client retainer funds despite no work having been performed for the clients; and

j.  sharing information that would be considered attorney-client privilege or work product doctrine materials with persons and entities outside of the attorney-client relationship.

60.     The USCA Defendants state they are able to eliminate the owners' contractual obligations to the timeshare developer but, instead, improperly take referral fees, or otherwise

share fees among themselves, all while providing no services to the owners. The statements are therefore false and/or misleading.

61.    There are a number of links between 1 Planet, Pluto (and their various subsidiaries), USCA, Sussman, and Portner. Those links are as follows.

62.    Sussman and Portner previously had a company named Nevada National Advertising, Inc. ("NNA"), which was a marketing company serving the timeshare exit industry. Portner was also involved with NNA in various capacities, including as an attorney working on behalf of NNA. Like the USCA Defendants, NNA was co-located with some of Portner's and Sussman's other entities, including USCA.

63.    NNA was eventually closed after lawsuits were filed against it (and, in some instances, Sussman and/or Portner) and the claims successfully prosecuted.

64.    Sussman and Portner are both individually and personally responsible for the actions of the USCA Defendants (as that term is defined hereinbelow).

65.    With respect to Portner, his individual control over the other USCA Defendants includes the following:

    a.    Portner is the ostensible owner and managing partner of the USCA law firm; because the USCA Defendants' scheme requires a law firm to operate, and a law firm must legally be owned and managed by an attorney admitted to the highest court of at least one state, Portner is an instrumental tool in operating the USCA Defendants' scheme;

    b.    Portner personally made and/or consented with the decision to operate USCA out of the same office as, and to intermingle USCA with, the marketing firm 1 Planet;

c. Portner is personally involved in, and approves, the marketing and advertising decisions and actions undertaken by at least some of the USCA Defendants, including, without limitation, USCA; and

d. Portner is personally involved in, and directs, the day-to-day operations of USCA, to such an extent that even though he claims the Florida Homestead Exemption over property located in Lake Worth, Florida, Portner spends more time in El Cajon, California (the location of the USCA Defendants) than he does in Lake Worth.

66.     With respect to Sussman, his individual control over the other USCA Defendants includes the following:

a. Sussman holds himself out as the 'manager' of USCA, even utilizing the email address <uscamanager@aol.com> when recruiting employees to the USCA Defendants and when apparently attempting to intimidate a witness in a civil action that was previously pending in the State of Texas;

b. many of the various Passive Websites (as that term is defined hereinbelow) state that Sussman is the person behind the marketing activities of the various USCA Defendants (including, without limitation, 1 Planet) and Sussman has held himself out as an expert in the false and misleading advertising engaged in by the USCA Defendants;

c. Sussman is one of the people (along with Portner) personally making the decisions and directing the activities of the USCA Defendants with respect to their false, deceptive, and misleading advertising and marketing; and

> d.  Sussman is the individual who controls the relationships between the USCA Defendants and other non-party third-party entities (such as ARMG, as described hereinbelow) and was personally directing how to accept consumers into the USCA Defendants' scam and how much those consumers needed to be charged; Sussman personally directed the use of USCA merchant accounts to process consumer payments for consumers that were recruited through non-party third-party entities (such as ARMG).

67.  Portner and Sussman have a long history together.  They have been – individually or together – parties to various lawsuits regarding their timeshare exit and advertising activities. Portner, individually, has been sanctioned twice by the Florida Bar and once by the United States Patent and Trademark Office for improper advertising practices and failing to properly represent clients.

**USCA Operations**

68.  The USCA Defendants market and solicit timeshare owners through a host of websites, call centers, direct marketing (such as bulk mailers), and aggressive search engine optimization ("SEO") strategies, and accept referrals for other non-party third-parties.

**a.  Websites**

69.  The USCA Defendants have registered and used numerous domain names and websites in an effort to hide their identities and interlinks, maximize their advertising reach and online advertising ranks, to lure as many customers as possible into their scheme, and to harm Diamond.  Through Sussman and Portner's control, Pluto and 1 Planet have registered a number of domain names, but done so using tools to shield their identity.  However, the USCA Defendants allowed the privacy shield to expire on some of those domains.

70.     One of the domain names where the USCA Defendants allowed the privacy shield to lapse is the domain <uscalaw.com>.  <uscalaw.com> automatically redirects consumers to USCA's main website, located at www.usconsumerattorneys.com.  *See* Exhibit 4 annexed hereto.  <uscalaw.com> was previously registered behind a privacy shield but is no longer protected.  A copy of the Whois history for <uscalaw.com> is annexed hereto as Exhibit 5.  The Whois history shows <uscalaw.com> was registered by Pluto Marketing, 7065 West Ann Road, Suite 130-165, Las Vegas, Nevada 89130 by a person using the email address sschwarz@lveas.com.

71.     The domain name <lveas.com> automatically redirects users to the domain name <lasvegaseventsandshows.com>, the website for Las Vegas Events and Shows ("LVEAS").  *See* Exhibit 6 hereto.  Las Vegas Events & Shows is a mark registered in the State of Nevada (*see* Exhibit 7 hereto), registered to Nevada Magazine, 401 North Carson Street, Carson City, Nevada 89701.  Sussman was the online publishing partner of the magazine and owner of the domain <lasvegaseventsandshows.com>.  A copy of a masthead from Nevada Magazine showing the relationship is annexed hereto as Exhibit 8.

72.     Pluto, at the direction and control of Sussman and in conjunction with Portner and USCA, owns the domain <uscalaw.com>, which has been set to automatically direct consumers to USCA's website, www.usconsumerattorneys.com.

73.     <uscalaw.com> is hosted on a computer or device utilizing the Internet Protocol ("IP") address 64.50.173.131, located in California.  *See* Exhibit 9 hereto.

74.     The subnet for that IP address (that is, all IP addresses in the range of 64.50.173.1-254) hosts a number of domain names that are related to the Defendants.  *See* Exhibit 10 hereto.

75.     Pluto is the owner of at least the following timeshare-related domain names:

    a.     <timesharefighter.com>;

    b.     <tsrsonline.com>;

    c.     <bestresortrentalandsale.com>;

    d.     <dumpyourtimesharenow.com>;

    e.     <pacificmonarchabankruptcy.com>; and

    f.     <timeshareresalesource.com>.

76.     <bestresortrentalandsale.com>,                   <dumpyourtimesharenow.com>, <pacificmonarchbankruptcy.com>, <timesharefighter.com>, and <tsrsonline.com> are all hosted on a computer or device utilizing the same IP address: 64.50.173.124, located in California. *See* Exhibit 11 hereto.  The domain <nevadanationaladvertising>, the domain for NNA, is also hosted at that same IP address. *Id.*

77.     Pluto Marketing, utilizing the same sschwarz@lveas.com email address, is listed as the owner of the following of the aforementioned domains: <tsrsonline.com>, <dumpyourtimesharenow.com>, <timesharefighter.com>, and <timeshareforadollar.com> (in addition to <uscalaw.com>).  A copy of the Whois information for these domains is annexed hereto as Composite Exhibit 12.

78.     Sussman and Portner, through the other USCA Defendants (or a combination thereof), have used a single web host to host webpages on each of these domains.  Those web pages are intentionally designed to engage in false advertising and SEO activities.

79.     Those webpages presently host webpages that are clearly involved in the timeshare exit business.  The USCA Defendants use these webpages to hide their true identities and funnel unsuspecting Diamond Owners to USCA.

80.     The USCA Defendants have also created a network of passive websites that are designed solely to 'squelch' bad reviews of the USCA Defendants or otherwise make it difficult for consumers to find negative reviews or 'tell alls' of the USCA Defendants and their schemes. By way of example, and not limitation, the USCA Defendants have apparently created at least the following websites with no purpose other than to engage in SEO and hide negative reviews of USCA, Portner, and Sussman.   These websites are false and misleading as they hide and disavow important information regarding the USCA Defendants:

     a.   usconsumerattorneysreviews.blogspot.in;

     b.   sites.google.com/site/usconsumerattorneyscomplaints/home;

     c.   usconsumerattorneysfalsenegativereviews.weebly.com;

     d.   issuu.com/usconsumerattorneys;

     e.   usconsumerattorneysfalsenegativereviews.wordpress.com;

     f.   usconsumerattorneysfalsecomplaints.blogspot.in;

     g.   usconsumerattorneysreviews.wordpress.com;

     h.   www.slidehsare.net/henryportner/henry-n-portner-the-noteworthy-attorney-in-florida-lake-worth;

     i.   nevadanationaladvertising.wordpress.com;

     j.   aboutus.com/Nevada-National-Advertising;

     k.   nevada-national-advertising.blogspot.com;

     l.   slideshare.net/Nevada-National-Advertising;

     m.   about.me/nevada.national.advertising;

     n.   smore.com/u/nevadanationaladvertising; and

     o.   nevadanationaladvertising.brandyourself.com

(collectively, the "Passive Websites"). The Passive Websites contain nothing but false and/or misleading information about the quality characteristics of the USCA Defendants' products and services.

81. www.dumpyourtimesharenow.com, the webpage hosted at <dumpyourtimesharenow.com> ("Dump Your Timeshare") is a timeshare exit business clearly and obviously linked with USCA.

82. Dump Your Timeshare hosts a 'wall of fame' page, where 'successful timeshare cancellation' letters are displayed. This page is located at http://dumpyourtimesharenow.com/successful-timeshare-cancellations.php#letters.

83. While Dump Your Timeshare attempts to redact all information regarding the businesses and/or lawyers allegedly representing the consumers referenced therein, it appears that at least the following lawyers are listed as having worked with Dump Your Timeshare:

    a.  Portner (working with NNA); and

    b.  Mitchell Reed Sussman, Robert Sussman's brother, and notorious timeshare exit lawyer.

84. Dump Your Timeshare hosts a 'video' (really, a slideshow) at http://dumpyourtimesharenow.com/timeshare-cancellation-presentation.php (the "DYT Video").

85. USCA also hosts a 'video' (really, a slideshow) at https://usconsumerattorneys.com/video/ (the "USCA Video").

86. The DYT Video and USCA Video are very similar and, in various aspects, identical, in many ways, including, without limitation, the following:

    a.  they are narrated by the same person;

    b.  they are both approximately 24 minutes in length;

c.  they are both videos that are a series of slides;

d.  after a customized introduction, both show the following slide:

 

e.  both then show the following slide:

 

f.  both videos show the following slide to give the impression that after a timeshare interest is foreclosed upon, there will be mandatory garnishments and deficiency judgments against the consumers, which is false and/or misleading as many states (including Florida) have laws that prohibit deficiency judgments in timeshare foreclosures:



;

g.  using identical examples (six in total), in the same order, of 'Recent Special Assessments';

h.  both show the following slide, which is false and/or misleading because the Defendants are not selective and will accept any person as a client:



;

i.  while showing the slides in subparagraph h, above, both videos claim their respective companies have a "100% success rate", which is false and/or deceptively misleading because they do not have a 100% success rate as many of their customers have their timeshare interests defaulted, cancelled, forfeited, and/or foreclosed upon, which no reasonable consumer would consider a

'success' as anybody can default on a payment obligation by simply not paying (meaning there is no reason to pay a third party thousands of dollars to default on a payment obligation);

j.   they both show the following slides, showing just how deceptive the USCA Defendants are, as the 'process' utilized by Dump Your Timeshare (which is not a law firm) and USCA (which ostensibly is a law firm) are *identical*, with the exception of Dump Your Timeshare using a "fully licensed specialist" while USCA utilizes an "experienced USCA Attorney" (which are really one and the same):

Timeshare Cancellation Presentation:





Timeshare Cancellation Presentation:





;

k.   a series of six slides allegedly showing examples of letters received by clients of Dump Your Timeshare (DYT Video) or USCA (USCA Video) 'releasing' the customer of their timeshare obligations, the first five slides, and the letters they show, are identical, showing letters from the following timeshare companies in this order: Wyndham Vacation Resorts, Bluegreen Resorts, Hilton Grand Vacations, and Woodstone at Massanutten; these letters are false and/or misleading because a consumer cannot be a customer of both Dump Your Timeshare and USCA, yet these letters are presented as actual results obtained by each organization individually (which is not true) and thus amount to false and/or misleading endorsements which are false and/or misleading advertising in and of themselves, additionally, the USCA Video does not contain the necessary disclaimers required by the Florida Bar (and other state bar associations) and therefore violates the Rules Regulating the Florida Bar:



l.   Dump Your Timeshare regularly refers to itself in the DYT Video as "U.S. Consumer Associates" both in the voiceover on the DYT Video and in a watermark in the bottom right hand corner of each slide of the DYT Video, which

has the same acronym – USCA – as Defendant, USCA, this leads to false and/or misleading slides such as the following, where Dump Your Timeshare states that the fee a consumer pays to Dump Your Timeshare covers 'as many hours as it takes' of 'legal research and preparation' and 'filing lawsuits if necessary':

 ; and

m. both videos steal text from the website http://tcpaa.org/government-consumer-protectorates-advisement/, the two videos then misquote the source (which is itself a misquote of the original article from the July 2011 edition of *The Costco Connection*, a copy of which is annexed hereto as Exhibit 13), which is false and/or misleading:[3]

---

[3] The TCPAA, which the two videos allege is a 'consumer protection organization' is nothing of the sort. It is actually an advertising front for The Abrams Firm, a timeshare exit 'law firm' in Olympia-Lacey, Washington run by John Phillip Abrams.







**b. The Call Center**

87.     Additionally, the USCA Defendants are interlinked by another of Sussman's companies, 1 Planet.

88.     1 Planet is co-located in the same office as USCA.

89.     1 Planet engages, at least, in the business of telemarketing solicitations.   An example resume found for a former employee of 1 Planet is annexed hereto as Exhibit 14.

90.     1 Planet engages in these call center activities at the direction, behest, and for the benefit of USCA and the other USCA Defendants.  Alternatively, some combination of 1 Planet,

Pluto, and/or USCA engages in direct telephone marketing (a/k/a "cold calling") to consumers, including Diamond Owners.  Additionally, the USCA Defendants accept referrals, and work with other marketing entities, such as ARMG.

### c.  Additional Advertisements

91.    The USCA Defendants are engaged in a variety of additional false and/or misleading advertising activities.

92.    USCA engages in Search Engine Optimization ("SEO") designed to increase its 'page rank' in searches and increase its exposure.  In order to do this, the USCA Defendants utilize metadata, coding, the Passive Websites, and backlinking to promote themselves. Recently, there were approximately 269 backlinks that are designed to increase the profile of the USCA Defendants.

93.    The USCA Defendants have purchased dozens of Google AdWords® incorporating Diamond's registered and unregistered intellectual property (the "Diamond Marks").  The advertisements are false and misleading, or have the tendency to mislead, and violate The Rules Regulating the Florida Bar.  Indeed, many of Defendants' advertisements are considered 'inherently deceptive' or improper lawyer referrals by the Florida Bar.

94.    To accomplish this, the USCA Defendants have engaged in, *inter alia*, a scheme of SEO that includes, but is not limited to, the following:

    a.  purchasing numerous Google AdWords® keywords[4] on the internet that incorporate and utilize the Diamond Marks, including, but not limited to, the following:

---

[4] 'Keywords' are the specific words used to trigger the display of an advertisement on Google's search results if the advertiser has agreed to pay enough to display their ad.

    i.   "cancel diamond resorts membership";

    ii.   "diamond resorts scams";

    iii.   "diamond resorts scam";

    iv.   "cancel diamond resorts timeshare";

    v.   "cancel diamond resorts";

    vi.   "cancel diamond timeshare";

    vii.   "diamond resorts class action lawsuit";

    i.   "how to get out of diamond resorts";

    ii.   "diamond resorts international problems";

    iii.   "diamond resorts international complaints"; and

    iv.   "how to cancel diamond resorts membership".

b.  purchasing numerous AdWords® that incorporate and utilize the Diamond Marks, which AdWords® relate to various Diamond branded properties without anything more, such as, but not limited to:

    i.   "diamond resorts arizona";

    ii.   "diamond resorts branson missouri";

    iii.   "diamond resorts international lake tahoe";

    iv.   "daily mirror diamond resorts"; and

    v.   "diamond timeshare".

c.  use of metatags and other embedded coding and wording, utilizing Diamond's intellectual property, to further drive Defendants' advertising to the top of search

engine results when consumers utilize searches including any of Diamond's intellectual property.[5]

95.     The USCA Defendants have, at varying times, also included direct references to Diamond on their various associated websites, including, without limitation, alleged evidence of the 'success' of their 'process' in 'exiting' consumers from their Diamond timeshare contracts. The USCA Defendants' use of Diamond Marks in connection with their online advertisements has not been to directly compare or criticize Diamond, but to create the impression that the USCA Defendants have a business association with or sponsorship by Diamond that enables the USCA Defendants to "cancel" Diamond Owners' Timeshare Contracts easily.

96.     The USCA Defendants also purchase AdWords® utilizing the Diamond Marks to advertise services Defendants specifically disclaim they actually provide.  For example, and not by way of limitation, the USCA Defendants have purchased AdWords® for "how to sell diamond resort timeshare", "diamond timeshares for sale", and "how do I sell my diamond resorts timeshare", amongst others.   Yet, during a call with potential customers, USCA specifically stated that it does not actually resell, sell, or broker timeshare properties.  A copy of a transcription of this call is annexed hereto as Exhibit 15.

97.     The call script contains a myriad of false and/or misleading statements (which are advertisements as the call script is a script that was regularly employed by the USCA Defendants), including:

a. stating that the host had been working with a 'intake manager' "for many years now" and that this individual was one of the "most respected and experienced

---

[5] Metatags and embedded coding and wording are akin to 'invisible ink' – they are the code that a consumer's web browser downloads and executes in order to display a webpage on the consumer's computer screen.  While invisible to the consumer, they are used by the consumer's computer and by search engines, such as Google, in determining how to rank webpages in search results and in the process of awarding AdWords® advertisements.

Intake Managers", which is false and/or misleading because the script contains blank spaces for the name of the alleged intake manager and therefore the foregoing was said about any person who happened to be an intake manager;

b. advertising USCA's "Guaranteed Solution" which, as set forth in this Second Amended Complaint, is false and/or misleading because there is no such 'guaranteed solution' other than foreclosure;

c. stating that "USCA is a law firm who's[si] Attorneys[sic] use the legal system to get your timeshare obligation cancelled directly with your resort developer. Guaranteed.", which is false and/or misleading because USCA does not use the "legal system" and the 'cancellation' is really a foreclosure;

d. stating that "[t]he reason why we are so successful getting our clients out of their contract is very simple[, w]e only work on a qualified basis, meaning we do not work with all timeshares.  We only work with timeshare owners when we know we can cancel them out of their contracts", which is false and/or misleading because USCA will take any U.S. based timeshare, does not qualify their clients, and knows it can cancel the contracts only because USCA can force a foreclosure;

e. stating that "Buying a timeshare gives the resort the right to take a default judgment out against a timeshare owner if they stop paying the fees", which is false and/or misleading because of the existence of anti-deficiency statutes; and

f. a variety of other false and/or misleading statements that are peppered throughout the call script.

98.    The USCA Defendants purchase an extraordinary amount of AdWords®.  By way of comparison, an analysis by Diamond shows that there are a global total of 3,963 total

AdWord® keywords purchased by USCA and Diamond.  Of these 3,963 keywords, 24 are purchased by both Diamond and USCA, Diamond purchased 437 unique keywords, and USCA purchased 3,502 unique keywords.  Overall, the USCA Defendants have created at least 1,348 combinations of advertisements and AdWord® keywords, including for keywords and ads that are wholly unrelated to the USCA Defendants' alleged business, such as:

    a.  "No More Paying Timeshare Fees – Get Out of your Timeshare" when consumers search for 'timeshare blog';

    b.  "Forced & Tricked in[sic] Buying a Timeshare & Want Out?  See Our Quick & Easy Process" when consumers search for 'diamond resorts arizona' or 'diamond resorts international lake tahoe'; and

    c.  "Scammed Into a Timeshare? – Exit Your Timeshare Contract" when consumers search for 'diamond resorts branson missouri'.

99.    Moreover, the advertisements and statements made by the USCA Defendants are false and/or misleading.  For example, there is no 'guaranteed' process for 'safely' 'exiting' a timeshare contract other than through the utilization of a program offered by Diamond, not the USCA Defendants.

100.    Many of the AdWord® ads purchased by Defendants, and the content on Defendants' website, is false and/or misleading, either literally or implicitly.

101.    The USCA Defendants make the following false and/or deceptively misleading statements on the USCA website:



*Eliminate Timeshare Contracts Easily*

### Did your Timeshare Salesperson:

» Present the membership offer to you for more than 90 minutes?
» Invite you to a free gift, trip, meal or event, which turned into a sales pitch?
» Tell you that the timeshare would go up in value over time?
» Claim that you could sell and/or rent your timeshare whenever you wish?
» Promise that they would buy it back from you if desired?

This is where US Consumer Attorneys comes to the rescue! These are unethical tactics and are considered coercive, and some of them are even fraudulent. If you were subjected to such treatment, your timeshare company can be held legally accountable.

Timeshare resort companies cannot legally use high-pressure tactics to force you to buy a timeshare membership. Many timeshare companies use lies, intimidation and fraudulent claims, which is illegal. US Consumer Attorneys demands that they cancel your timeshare contract, permanently. We'll Beat Any Price for Paid In Full Timeshare Transfers!

Contact Us now to **Cancel your Timeshare Contract**.

None of the 'tactics' listed on the website are unethical or 'considered coercive' or 'fraudulent' and none are legitimate grounds for legally terminating a timeshare contract, stating and/or inferring that they are valid grounds upon which to breach a Timeshare Contract is deceptive and/or misleading.

102.    In their marketing videos (as set forth in Paragraph 86), the USCA Defendants represent that they have a 100% success rate and that they "never go to trial", neither of which is true or, if true, are misleading because the 'success rate' includes foreclosures, which is not a success by any measure.   Moreover, stating that they "never go to trial" is a false and/or

misleading statement by USCA as it has represented a client, who is a Diamond Owner, through binding arbitration, a matter that USCA lost badly.

103.    In fact, the USCA Defendants have admitted that outside of a statutory rescission period, a timeshare contract can only be terminated "[i]n certain states and in limited circumstances" and that this usually entails "bringing a lawsuit against the timeshare company."

104.    USCA almost never brings lawsuits on behalf of consumers.  Thus, the USCA Defendants know they are falsely advertising to the public – on one hand they tell every consumer that they have a 100% success rate, that they are selective in the cases they take, and that they have a plan and solution for their consumers, but on the other hand they have admitted that they have to bring lawsuits to even attempt to terminate a timeshare contract, an action USCA almost never takes.

105.   The advertisements listed in Paragraphs 35; 59(a), (b), (d), and (e); 60; 80; 86; 92-94; and 97-102, and Exhibits 2, 3, and 15, together, the "USCA Defendants' False and Misleading Advertisements."

106.   Many of the USCA Defendants' False and Misleading Advertisements are considered to be "Deceptive and Inherently Misleading" by Rule 4-7.13 of the Florida Bar Rules of Professional Conduct and violate other clauses of the Florida Bar Rules of Professional Conduct.

107.   The USCA Defendants engage in passive 'pull' advertising on the internet by, *inter alia*, purchasing Google AdWords® and a variety of other means, as more fully described hereinbelow.  Additionally, the USCA Defendants, through the entities 1 Planet, Pluto, and at least some of John Does #1-50, and non-party third-party entities engage in active 'push' advertising through direct to consumer mailings and telemarketing.

**D.  NEWTON GROUP AND DC LAW**

108.   Separately, the Newton Defendants are a timeshare exit scheme that bill themselves as "The #1 Trusted Timeshare Exit Company" and "The #1 Trusted Name In Timeshare Exit".  *See* http://newtongrouptransfers.com.

109.   Newton Group has at least three related companies.  The first, Newton ESA, acts a marketing company (similar to 1 Planet and Pluto).  The "ESA" in Newton ESA's name stands for "elite sales associates".  The second, IBD, acts as an apparently unlicensed timeshare broker. The third, Newton Exit, holds powers of attorney forms from Diamond Owners.

110.   The Newton Defendants all engage in fee splitting amongst themselves and intermix their finances.  Annexed hereto as Exhibit 16 is a 'Payment Authorization Form' from the Newton Defendants, showing fee splitting between Newton Group and IBD.  Annexed hereto

as Exhibit 17 is a transaction receipt for the Payment Authorization Form annexed at Exhibit 16. The payment to IBD was processed through Newton ESA's merchant account.

111.    Newton Exit also works with the other Newton Defendants (Newton Group, Newton ESA, and IBD).  As part of their common scheme, the Newton Defendants require a consumer (including Diamond Owners) to execute a 'power of attorney' to act as the consumer's 'attorney-in-fact' in order to isolate communication between the consumer and the outside world. This 'power of attorney' is given to Newton Exit.  A copy of the form 'power of attorney' is annexed hereto as Exhibit 18.

112.    Newton Group and Newton ESA are so intertwined that the client 'welcome letter' utilized by the Newton Defendants is signed on behalf of both Newton Group and Newton ESA.  A copy of one such 'welcome letter' is annexed hereto as Exhibit 19.

113.    While not purporting to be a law firm like USCA, the Newton Defendants refer Diamond Owners to law firms that purport to be able to eliminate the owners' contractual obligations to Diamond but, instead, improperly take referral fees, or otherwise share fees among themselves, all while providing no real services to the owners.  The Newton Defendants use both USCA and DC Law as the recipient of its improper referrals, and improperly split fees with each of them such that both USCA and DC Law benefit from the Newton Defendants' false and/or misleading advertising.

**Newton Group's Operations**

114.    Newton ESA advertises that it provides the following services:



.

The other Newton Defendants, and other, presently unknown timeshare exit companies, utilize Newton ESA's services to market to consumers.

115.   Newton ESA utilizes phone agent cold calling, phone agent lead cultivation, voice mail marketing, form emails, fax blasting, text messaging, and direct mail techniques.  These advertisements are false and/or deceptively misleading.

116.   One of the letters Newton ESA sends on behalf of the Newton Defendants (or that Newton Group sends on its own behalf) is annexed hereto as Exhibit 20.   As set forth hereinabove, this advertisement is false and/or misleading as there are no "new Timeshare Laws" that "allow[] developers to raise maintenance fees with no restriction" and there is no "new Timeshare Laws" that make exiting a timeshare any more difficult (other than by targeting TPE schemes, such as the Newton Defendants, and closing their illegal operations).   This advertisement is designed solely to lie to and/or mislead the consuming public, including Diamond Owners, and induce them to attend a meeting hosted by the Newton Defendants.

117.    A different letter utilized by the Newton Defendants claims that the consumer has been "pre-qualified" to participate in the Newton Defendants' alleged exit program.   This advertisement is false and/or misleading as there is no "pre-qualification", anyone willing to pay what the Newton Defendants demand is eligible to become a customer of the Newton Defendants.

118.    Yet another piece of false and/or misleading advertising utilized by the Newton Defendants is their 'Consumer's Guide to Timeshare Exit', a copy of which is annexed hereto as Exhibit 21.  The Newton Defendants offer 'The Consumer's Guide to Timeshare Exit' freely on the internet, and particularly to persons who submit their contact information through one of the Newton Defendants' many websites.  In 'The Consumer's Guide to Timeshare Exit', in Section 2 titled "*High-Risk* Timeshare Exit Strategies" (emphasis supplied) the Newton Defendants state:

> **CONTACTING THE RESORT**
>
> The resorts are experts at getting people into timeshares (not out of them). For that reason, it is dangerous to contact them for assistance in exiting your timeshare. They have no financial incentive in getting you out of your contract, and many representatives will use existing owners' vulnerability against them to attempt to sell them more properties.

.

This statement is blatantly false.   Many timeshare developers, including Diamond, offer programs (in Diamond's case, the program is named Transitions®) that allow Diamond Owners to exit their timeshare interests for little to no cost.

119.    This last false and/or misleading advertisement is particularly insidious.   By specifically lying to and/or misleading consumers into believing that contacting Diamond, which offers its own exit program (Transitions®), is somehow a "high-risk" activity that would lead to a Diamond Owner purchasing more timeshare interests, the Newton Defendants are willfully

hiding the existence of the Transitions® program.  The Newton Defendants do this so they can charge Diamond Owners thousands of dollars only to enroll the Diamond Owners in the Transitions® program, a step the owner could have taken on their own for low or no cost, allowing the Newton Defendants to keep all, or nearly all, of their fee and claim a 'victory' in exiting the owner from their Timeshare Contract.  Thus, the Newton Defendants intentionally lie to and misdirect Diamond Owners away from the Transitions® program (or other offers Diamond may make) so that the Newton Defendants can profit greatly to the detriment of the Diamond Owners and Diamond.

120.    While carrying out an audit of the Transitions® program, Diamond contacted some Diamond Owners who had enrolled in Transitions®.  Many of these Diamond Owners who were contacted by Diamond revealed that they were working with one or more of the Newton Defendants.  One or more of the Newton Defendants were taking money from these Diamond Owners to do nothing more than enroll the Diamond Owners in Transitions® and keeping the entire fee for themselves.  The 'services' performed by the Newton Defendants were thus illusory because they did nothing for the Diamond Owners that the Diamond Owners could not have done for themselves.

121.    The Newton Defendants engage in mass bulk mailing and telemarketing.  The Newton Defendants apparently purchase leads and/or client lists from third-party sources.  This results in numerous complaints against the Newton Defendants for 'spam' and unwanted advertising.  The Newton Defendants have even sent advertising to timeshare resort developer employees.

122.     The purpose of the Newton Defendants' false and/or misleading advertisements is to trick the consuming public, including Diamond Owners, in to retaining the Newton Defendants' illusory timeshare exit services.

**Newton Defendants' Referrals to Attorneys**

123.     The Newton Defendants 'timeshare transfer exit' purports to be a process by which a timeshare interest is transferred from a consumer without the use of an attorney.  What Newton Group actually does is engage in fraudulent deed transfers, using quit claim deeds (or other deeds that have not been countersigned by the timeshare company) to transfer the timeshare interests from the consumers to a strawman buyer, who then defaults on payments and suffers a mass foreclosure, i.e., the 'Viking Ship' scheme.

124.     Additionally, the Newton Defendants falsely advertise their 'skin in the game guarantee' whereby the Newton Defendants state that a consumer will never pay the Newton Defendants or the timeshare company any more money because the Newton Defendants will become "financially responsible for your timeshare until it is out of your name" and that this is important because "[i]n this way, our goals are aligned. The longer it takes us to complete the transfer process, the more it cost us in fees to the resort. Both company and client want to see an expedient end to your timeshare ownership."  In reality, many consumers, including Diamond Owners, have gone into default on their accounts because the Newton Defendants do not assume financial responsibility for the timeshare interest and do not make required payments.  In this way, the Newton Defendants accomplish a 'timeshare exit' through default and foreclosure.

125.     The Newton Defendants 'timeshare attorney exit' is essentially an illegal and improper attorney referral scheme.  The Newton Defendants advertise that:

**If you do need an attorney, Newton Group Transfers will hire you an experienced timeshare exit attorney and back your legal representation with the following Newton Group Guarantees:**

*Our Representation Guarantee.* Newton Group Transfers will hire an experienced timeshare exit attorney to represent you, the timeshare owner. Some companies state that they have "attorneys on staff" but those attorneys would not represent you. When we hire an attorney for you, they will represent you and your interests. You will receive a letter of representation to confirm that the attorney is in fact representing you.

**Our "One Flat Fee" Guarantee.** With a timeshare exit, the number of hours involved is unknown, which could leave you exposed to outrageous legal fees if billed by the hour. Having one all-encompassing fee assures you that your attorney is aligned with your goal of ending your timeshare ownership as soon as possible. Furthermore, this will guard against any additional legal fees in the event of litigation with the resort. Keep in mind, you could still be subject to additional settlement fees from the resort.

**Our 100% Money Back Guarantee.** If the attorney we hire to represent you fails to either provide an exit solution or settlement agreement, Newton Group Transfers will return ALL of your money.

126.    The Newton Defendants refer consumers to USCA and DC Law (and many others, *see* Exhibit 22 annexed hereto), which then carry on the scheme as set forth in this Second Amended Complaint.  These referrals are a direct result of the false and/or misleading advertising engaged in by the Newton Defendants.  USCA and DC Law pay for these false and/or misleading advertising services either through direct payments and/or allowing the Newton Defendants to keep a portion (frequently a substantial portion) of the fee paid to the Newton Defendants by a Diamond Owner.

127.    When referring a Diamond Owner to a law firm, the Newton Defendants, in form documents that they use (and in advertising contained on their websites) state that the attorney is being retained at 'no cost' to the owner.  This is false and/or misleading because, in reality, retaining the attorney is about the only thing the Newton Defendants have done for the Diamond Owner.  This referral is one of the reasons Newton Exit obtains a 'power of attorney' from Diamond Owners.

128.    Once referred to the law firm, the law firm furthers and assists in the fraudulent scheme by sending standard form letters on behalf of the Diamond Owner to Diamond directing

that Diamond cease communicating with the owner.  Examples of such letters sent by DC Law are attached hereto as Composite Exhibit 23.

129.    All of these letters acknowledge that DC Law has no method or means to assist the consumer in exiting their timeshare contract; they summarily state that the Diamond Owner "has exhausted all known avenue of divestiture to no avail" and then requests that the company merely retake the timeshare contract.  Diamond denies the requests and notifies DC Law that the requests are denied, yet DC Law fails to inform the Diamond Owners of this.

130.    DC Law sent 31 of those letters on the exact same day, which suggests that DC Law, or one of the other Newton Defendants, solicited these Diamond Owners through false and/or misleading representations regarding their timeshare exit services.   Indeed, it is improbable that all 31 of these Diamond Owners would retain DC Law on the same day if DC Law honestly informed the consumers that they have no "avenue of divesture" other than asking Diamond to terminate the contract.

131.    Many of the DC Law form letters are allegedly from Diamond Owner who paid their Timeshare Contract in full, or owed minimal amounts of money (far less than they paid the Newton Defendants and DC Law).  DC Law, and/or one of the Newton Defendants, undoubtedly misrepresented facts to those owners because Diamond has a program to terminate contracts that are paid in full.  No owner would pay DC Law if they were informed that Diamond would simply terminate the contract.

132.    Diamond does not contend that consumers are not permitted to retain legal counsel; rather Diamond contends that the Defendants' solicitation of consumers through fraudulent and misleading representations, done in connection with the law firms, and the law firms subsequent acts done in furtherance of the scheme is improper.

133.    The advertisements listed in Paragraphs 36, 115-119, 121, 123-125, 127, 130, and 131, and Exhibits 20 and 21, together, will be referred to as the "Newton Defendants' False and Misleading Advertisements."

### E.  DEFENDANTS' PROMISES ARE ILLUSORY

134.    None of the Defendants have a 'process' or 'legal' basis for 'cancelling' a consumer's timeshare contract.  Defendants, through USCA, Newton Group, and/or DC Law (and potentially other avenues) send form letters to Diamond with little to no follow-up.  Many of these letters are nonsensical, reference non-existent laws, reference irrelevant laws, and admit that the Diamond Owners will default on their payment obligations.  The letters admit that a default will occur because Defendants have instructed the Diamond Owners to cease making payments and, in fact, have promised the Diamond Owners that once the Diamond Owners retain Defendants they (the Diamond Owners) will never have to make another payment to Diamond again.

135.    When viewed as a whole, the USCA Defendants' False and Misleading Advertisements and the Newton Defendants' False and Misleading Advertisements (collectively the "False and Misleading Advertisements") are not puffery.  Thousands of consumers have fallen prey to Defendants' false and/or deceptively misleading advertisements and have retained Defendants to render them illusory services.  While Defendants will undoubtedly claim that no reasonable person would ever rely on their advertisements, such allegations are clearly inapposite and incompatible with the clear facts and reality.  Those clear facts show the reality of consumer behavior: thousands of consumers have paid Defendants thousands or tens of thousands of dollars each for Defendants' 'guaranteed', 'safe', 'proven', and 'effective' 'process', only to have their timeshare interests terminated, cancelled, defaulted, and/or

foreclosed upon for non-payment.  No rational consumer would pay such sums of monies to a third-party to achieve the same results (cancellation, defaults, and/or foreclosures for non-payment) that they could achieve on their own through the simple act of not paying.  Many timeshare owners, including Diamond Owners, who pay Defendants for their illusory services ultimately suffer the same fate as any other consumer who simply elects not to make payments on their timeshare contracts; the only difference between many consumers who simply stop paying, and those who retain Defendants' illusory services, is that the latter group of consumers lose additional thousands or tens-of-thousands of dollars to Defendants on top of what they lose by defaulting on their payment obligations.  Moreover, many of the False and Misleading Advertisements are considered 'inherently deceptive' by the Florida Bar.

136.    The False and Misleading Advertisements cause direct harm to Diamond.  The False and Deceptive Advertisements make false and/or deceptively misleading statements about both Defendants' products and services, and Diamond's products and services.  These statements both deceive consumers, including Diamond Owners, into retaining Defendants' services, but also damage Diamond.  Defendants exist for the sole purpose of interfering in Diamond's contracts with the Diamond Owners.  Because Diamond Owners can be either a customer of Defendants, or a customer of Diamond, but not both, they are competitors and there is a direct relationship between Defendants' false and/or deceptively misleading advertising and harm to Diamond in that the False and Misleading Advertisements are solely designed to induce Diamond Owners into retaining Defendants, who then immediately instruct those Diamond Owners to cease making payments to Diamond, diverting contractual payments from Diamond to Defendants.

F. **DIAMOND'S RIGHT TO INJUNCTIVE RELIEF**

137.    Defendants' solicitation of Diamond Owners using false and misleading advertising and their subsequent instruction to and/or persuasion of the Diamond Owners to stop making payments on the Timeshare Contracts, including all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation with Diamond, is harming Diamond.

138.    Defendants continue to engage and intend to further engage in the unlawful conduct described above.

139.    Defendants' actions present an immediate threat of irreparable harm to Diamond, and Diamond will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

140.    The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Diamond Owners using the false and/or misleading advertising outlined above; and then convince the Diamond Owners to immediately stop paying Diamond.  These defaults result in loss of good will and damages to the customer relationship with other Diamond Owners that are not in default and enjoying their Diamond Contracts.

141.    Non-defaulting Diamond Owners are also damaged because the non-payment of taxes and maintenance fees by the defaulting Diamond Owners force the non-defaulting Diamond Owners to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

142.    Diamond will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

143.     Diamond has no adequate remedy at law as damages will not address the harm Diamond will suffer if Defendants are permitted to continue with this activity.

144.     The injury and potential harm caused by Defendants' intentional inference with Diamond's relationships outweigh the harm, if any, that an injunction would cause to Defendants.

145.     The issuance of the requested injunction will serve the public interest by protecting Diamond's legitimate business interests and the interests of the Diamond Owners, and by restraining the unlawful, disruptive and tortious actions committed by Defendants.

G.     **CAUSES OF ACTION**

**COUNT I**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the USCA Defendants)

146.     Diamond adopts and realleges paragraphs 1 through 107 and 132 through 145 above as if fully set forth herein.

147.     This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for the USCA Defendants' False and Misleading Advertisements regarding the USCA Defendants' own products and services.

148.     The USCA Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the USCA Defendants' False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

149.     The USCA Defendants' False and Misleading Advertisements described above were commercial speech made by a Defendant acting in competition to Diamond by trying to

interfere with Diamond's business relationships for the USCA Defendants' own financial gain, for the purpose of influencing consumers to retain the USCA Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

150.    The USCA Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

151.    The USCA Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Diamond or utilize the Transitions® Program, which is available to assist Diamond Owners who may wish to legitimately terminate their timeshare ownership with Diamond.

152.    The USCA Defendants deceive the consuming public by knowingly concealing the existence of the Transitions® Program and concealing the legitimate options available to Diamond Owners, and instead tell consumers that Diamond will do nothing to help consumers end their timeshare ownership.

153.    The USCA Defendants' advertised services affect interstate commerce.

154.    The USCA Defendants are operating as competitors to Diamond.  Once a Diamond Owner enters into an agreement with a USCA Defendant, the sole purpose of that agreement is to cause that Diamond Owner to withdraw his or her business from Diamond, effectively converting that individual from a Diamond Owner to a customer of the Defendant.

155.    Diamond has been and continues to be injured as a result of Defendants' false and misleading statements.

156.    Pursuant to 15 U.S.C. § 1117, Diamond is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Diamond Owners, and (iii) the costs of the action.

157.    Pursuant to 15 U.S.C. § 1116, Diamond seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the USCA Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the USCA Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the USCA Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the USCA Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Diamond Owners' timeshare interests.

**COUNT II**
**Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against the Newton Defendants)

158.    Diamond adopts and realleges paragraphs 1 through 57 and 108 through 145 above as if fully set forth herein.

159.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).  More specifically, this is an action for the Newton Defendants' False and Misleading Advertisements regarding the Newton Defendants' own products and services.

160.    The Newton Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers, specifically, the Newton Defendants' False and Misleading Advertisements.  These statements, incorporated herein, were literally false, either on their face or by necessary implication, as set forth herein, or materially misleading.

161.    The Newton Defendants' False and Misleading Advertisements described above were commercial speech made by a Defendant acting in competition to Diamond by trying to interfere with Diamond's business relationships for the Newton Defendants' own financial gain, for the purpose of influencing consumers to retain the Newton Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

162.    The Newton Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

163.    The Newton Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Diamond or utilize the Transitions® Program, which is available to assist Diamond Owners who may wish to legitimately terminate their timeshare ownership with Diamond.

164.    The Newton Defendants deceive the consuming public by knowingly concealing the existence of the Transitions® Program and concealing the legitimate options available to Diamond Owners, and instead tell consumers that Diamond will do nothing to help consumers end their timeshare ownership.

165.    The Newton Defendants' advertised services affect interstate commerce.

166.    The Newton Defendants are operating as competitors to Diamond.  Once a Diamond Owner enters into an agreement with a Newton Defendant, the sole purpose of that agreement is to cause that Diamond Owner to withdraw his or her business from Diamond, effectively converting that individual from a Diamond Owner to a customer of the Defendant.

167.    Diamond has been and continues to be injured as a result of Defendants' false and misleading statements.

168.    Pursuant to 15 U.S.C. § 1117, Diamond is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Diamond Owners, and (iii) the costs of the action.

169.    Pursuant to 15 U.S.C. § 1116, Diamond seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Newton Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of the Newton Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Newton Defendants, as well as their agents, representatives, employees, affiliates, prohibiting the Newton Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Diamond Owners' timeshare interests.

**COUNT III**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against USCA)

170.     Diamond adopts and realleges paragraphs 1 through 107 and 132 through 145 above as if fully set forth herein.

171.     This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

172.     The USCA Defendants (except USCA) willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

173.     Diamond has been and continues to be injured as a result of the USCA Defendants' (except USCA) false and misleading statements.

174.     USCA has contributed and continues to contribute to the other USCA Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

175.     USCA explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.  Without USCA's willingness to accept those consumers as clients, the USCA Defendants (except USCA) could not advertise what they do.

176.     The USCA Defendants' (except USCA) false advertisements are public, serious, and widespread, and USCA has full knowledge of such advertising and condones it.

177.     More than that, USCA financially gains from the false advertisements in the form of client referrals and fee splitting with the USCA Defendants (except USCA).

178.    In other words, USCA's business derives much, if not all, of its revenue from the consumers solicited through the USCA Defendants' (except USCA) false advertising.

179.    Pursuant to 15 U.S.C. § 1117, Diamond is entitled to recover (i) its actual damages sustained as a result of the false advertising by the USCA Defendants (except USCA), (ii) USCA's profits resulting from the USCA Defendants' (except USCA) false advertising to Diamond Owners, and (iii) the costs of the action.

180.    Pursuant to 15 U.S.C. § 1116, Diamond seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by USCA of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against USCA for damages, corrective advertising, and disgorgement of USCA's profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against USCA, as well as their agents, representatives, employees, affiliates, prohibiting USCA from further contributing to the false and misleading statements in advertising, including accepting any clients solicited by the other USCA Defendants through the false advertisement of any ability to cancel or end Diamond Owners' timeshare interests.

## COUNT IV
## <u>Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)</u>
(against USCA)

181.    Diamond adopts and realleges paragraphs 1 through 145 above as if fully set forth herein.

182.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

183.    The Newton Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

184.    Diamond has been and continues to be injured as a result of the Newton Defendants' false and misleading statements.

185.    USCA has contributed and continues to contribute to the Newton Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

186.    USCA explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.  Without USCA's willingness to accept those consumers as clients, the Newton Defendants could not advertise what they do.

187.    The Newton Defendants' false advertisements are public, serious, and widespread, and USCA has full knowledge of such advertising and condones it.

188.    More than that, USCA financially gains from the false advertisements in the form of client referrals and fee splitting with the Newton Defendants.

189.    In other words, USCA's business derives much, if not all, of its revenue from the consumers solicited through the Newton Defendants' false advertising.

190.    Pursuant to 15 U.S.C. § 1117, Diamond is entitled to recover (i) its actual damages sustained as a result of the false advertising by the Newton Defendants, (ii) USCA's

profits resulting from the Newton Defendants' false advertising to Diamond Owners, and (iii) the costs of the action.

191.    Pursuant to 15 U.S.C. § 1116, Diamond seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by USCA of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against USCA for damages, corrective advertising, and disgorgement of USCA's profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against USCA, as well as their agents, representatives, employees, affiliates, prohibiting USCA from further contributing to the false and misleading statements in advertising, including accepting any clients solicited by the Newton Defendants through the false advertisement of any ability to cancel or end Diamond Owners' timeshare interests.

## COUNT V
### Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against DC Law)

192.    Diamond adopts and realleges paragraphs 1 through 157 and 108 through 145 above as if fully set forth herein.

193.    This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

194.    The Newton Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead

consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

195.   Diamond has been and continues to be injured as a result of the Newton Defendants' false and misleading statements.

196.   DC Law has contributed and continues to contribute to the Newton Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it.

197.   DC Law explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.  Without DC Law's willingness to accept those consumers as clients, the Newton Defendants could not advertise what they do.

198.   The Newton Defendants' false advertisements are public, serious, and widespread, and DC Law has full knowledge of such advertising and condones it.

199.   More than that, DC Law financially gains from the false advertisements in the form of client referrals and fee splitting with the Newton Defendants.

200.   In other words, DC Law's business derives much, if not all, of its revenue from the consumers solicited through the Newton Defendants' false advertising.

201.   Pursuant to 15 U.S.C. § 1117, Diamond is entitled to recover (i) its actual damages sustained as a result of the false advertising by the Newton Defendants, (ii) DC Law's profits resulting from the Newton Defendants' false advertising to Diamond Owners, and (iii) the costs of the action.

202.    Pursuant to 15 U.S.C. § 1116, Diamond seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by DC Law of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against DC Law for damages, corrective advertising, and disgorgement of DC Law's profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against DC Law, as well as their agents, representatives, employees, affiliates, prohibiting DC Law from further contributing to the false and misleading statements in advertising, including accepting any clients solicited by the Newton Defendants through the false advertisement of any ability to cancel or end Diamond Owners' timeshare interests.

## COUNT VI
### Tortious Interference with Contractual Relations
(against the USCA Defendants)

203.    Diamond adopts and realleges paragraphs 1 through 107 and 132 through 145 above as if fully set forth herein.

204.    This is a cause of action for tortious interference with contractual relations.

205.    Diamond has contractual relationships with its timeshare owners.

206.    The USCA Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Diamond and the Diamond Owners. The very fact that Plaintiffs have a business relationship with the Diamond Owners is the basis upon which the USCA Defendants sought to establish a relationship with the Diamond Owners.  Indeed, if it

were not for the existence of the contractual relationships between Diamond and the Diamond Owners, the USCA Defendants would have no reason to exist.

207.    The USCA Defendants, through various inter-related entities as described hereinabove, have successfully solicited Diamond Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

208.    In particular, the USCA Defendants have intentionally procured the breach of Diamond's contractual relationships by soliciting Diamond Owners and persuading them to hire the USCA Defendants to help "cancel" (in reality, breach) their Timeshare Contracts. The USCA Defendants also procure breaches by directly instructing Diamond Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

209.    If Diamond Owners knew the truth about the USCA Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to the USCA Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

210.    The USCA Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

211.    The USCA Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from the USCA Defendants' actions and without reasonable grounds for the USCA Defendants to believe that their actions were justified and proper.

212.     As a direct and proximate result of the USCA Defendants' intentional misconduct, Diamond Owners have terminated, or have baselessly sought to terminate, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.  These terminations, and attempted terminations, also interfere with Diamond's ability to enter into subsequent transactions with those same Diamond Owners.

213.     The USCA Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the USCA Defendants are strangers to the contractual relationships between Diamond and its Owners, and their interference with Plaintiffs' business is willful and malicious.

214.     Furthermore, USCA profits greatly by accepting significant fees from Diamond Owners (through the USCA Defendants) and then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts.  USCA is not privileged to interfere with Diamond's contractual relationships because USCA acts in its own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by USCA or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free, or at a much lower cost, by appealing directly to Diamond or utilizing the Transitions® program. Furthermore, USCA undermines its so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Diamond Owners for the equitable rescission of those Timeshare Contracts.  USCA's across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized

legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

215.     As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

216.     Plaintiffs are entitled to damages against all USCA Defendants jointly and severally.

217.     The USCA Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Diamond in the disruption of customer and other contractual relations; therefore, Diamond does not have an adequate remedy at law.

218.     The USCA Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the USCA Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the USCA Defendants and their agents, representatives, employees, and affiliates, prohibiting the USCA Defendants from contacting Diamond Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Diamond Owners.

## COUNT VII
### Tortious Interference with Contractual Relations
(against the Newton Defendants and DC Law)

219.     Diamond adopts and realleges paragraphs 1 through 57 and 108 through 145 above as if fully set forth herein.

220.     This is a cause of action for tortious interference with contractual relations.

221.     Diamond has contractual relationships with its timeshare owners.

222.     The Newton Defendants and DC Law have actual, constructive, and/or specific knowledge of the contractual relationships between Diamond and the Diamond Owners. The very fact that Plaintiffs have a business relationship with the Diamond Owners is the basis upon which the Newton Defendants and DC Law sought to establish a relationship with the Diamond Owners.   Indeed, if it were not for the existence of the contractual relationships between Diamond and the Diamond Owners, the Newton Defendants and DC Law would have no reason to exist.

223.     The Newton Defendants and DC Law, through various inter-related entities as described hereinabove, have successfully solicited Diamond Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

224.     In particular, the Newton Defendants and DC Law have intentionally procured the breach of Diamond's contractual relationships by soliciting Diamond Owners and persuading them to hire the Newton Defendants and DC Law to help "cancel" (in reality, breach) their Timeshare Contracts. The Newton Defendants and DC Law also procure breaches by directly instructing Diamond Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

225.     If Diamond Owners knew the truth about the Newton Defendants and DC Law illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to the Newton Defendants and DC Law nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

226.     The Newton Defendants and DC Law have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

227.    The Newton Defendants and DC Laws' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from the Newton Defendants and DC Laws' actions and without reasonable grounds for the Newton Defendants and DC Law to believe that their actions were justified and proper.

228.    As a direct and proximate result of the Newton Defendants and DC Laws' intentional misconduct, Diamond Owners have terminated, or have baselessly sought to terminate, their contractual relationships with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.   These terminations, and attempted terminations, also interfere with Diamond's ability to enter into subsequent transactions with those same Diamond Owners.

229.    The Newton Defendants and DC Law did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as the Newton Defendants and DC Law are strangers to the contractual relationships between Diamond and its Owners, and their interference with Plaintiffs' business is willful and malicious.

230.    Furthermore, DC Law profits greatly by accepting significant fees from Diamond Owners (through the Newton Defendants) and then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts.   DC Law is not privileged to interfere with Diamond's contractual relationships because DC Law acts in its own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by DC Law or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free,

or at a much lower cost, by appealing directly to Diamond or utilizing the Transitions® program. Furthermore, DC Law undermines its so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Diamond Owners for the equitable rescission of those Timeshare Contracts. DC Law's across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

231.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

232.    Plaintiffs are entitled to damages against the Newton Defendants and DC Law jointly and severally.

233.    The Newton Defendants and DC Laws' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Diamond in the disruption of customer and other contractual relations; therefore, Diamond does not have an adequate remedy at law.

234.    The Newton Defendants and DC Law conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against the Newton Defendants and DC Law, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Newton Defendants and DC Law and their agents, representatives, employees, and affiliates, prohibiting the Newton Defendants and DC Law from

contacting Diamond Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Diamond Owners.

**COUNT VIII**
**Civil Conspiracy**
(against all Defendants)

235.    Diamond adopts and realleges paragraphs 1 through 145 above as if fully set forth herein.

236.    This is a cause of action for civil conspiracy to interfere with existing contractual relations and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

237.    Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

238.    Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' contractual relations with it owners and collectively causing its owners to breach their Timeshare Contracts with Plaintiffs.

239.    Each Defendant committed or engaged in an overt act in furtherance of their unlawful conspiracy to interfere with Plaintiffs' contractual relations or to induce Plaintiffs' customers to breach their Timeshare Contracts.

240.    Defendants conspired to interfere with Plaintiffs' contractual relationships with the Diamond Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Diamond Owners.

241.    As a direct and proximate result of Defendants' civil conspiracy, Diamond Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those Contracts.

242.    Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

243.    Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Diamond and its business millions of dollars in actual damages.

244.    Defendants are jointly and severally liable to Plaintiffs for damages.

245.    Defendants maliciously and purposefully act, using shell companies and numerous websites, as well as lawyers who only advertise other fields of legal practice, to hide their misconduct, and to divert and abscond with funds from Diamond Owners and interfere with the contractual relationships between Diamond Owners and Diamond.

246.    Defendants acted willfully and with malice in taking these actions.

247.    Defendants' conduct therefore entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate.

**COUNT IX**
**Violations of Florida's Deceptive and Unfair Trade Practices Act**
(against all Defendants)

248.    Diamond adopts and realleges paragraphs 1 through 145 above as if fully set forth herein.

249.    This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

250.    Diamond is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

251.    Diamond Owners are consumers for purposes of FDUTPA.

252.    Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

253.    Defendants are engaged in deceptive and unfair practices, including luring Diamond Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Diamond consumers to pay substantial fees to "cancel" their contracts with Diamond, when, in many instances, a lawful termination is only available to consumers directly from Diamond, a party to the Timeshare Contracts, through the Transitions® Program or otherwise.

254.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Diamond Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

255.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than

the actual damage remedy under § 510.211(2), Fla. Stat. *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

256.    Diamond is a party aggrieved by Defendants' violation of FDUTPA, Section 501.204(1), Fla. Stat.

257.    As a result of Defendants' actions, Diamond has suffered financial loss.

258.    Diamond's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

259.    Diamond is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter injunctive relief against all Defendants, award Plaintiffs their costs, including their reasonable attorney's fees, and for such other and further relief as the Court deems appropriate.

Dated: November 30, 2018.

/s/ Alfred J. Bennington

**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed this 30th day of November, 2018 via CM/ECF, which caused a copy of the foregoing to be served on all counsel of record.  I also certify that, for the newly added defendants (Pluto, 1 Planet, Newton Group, Newton ESA, IBD, Newton Exit, and DC Law) proposed summonses have been uploaded to the Clerk of the Court via CM/ECF and that, once the summons are issued by the Clerk of the Court, I will cause a copy of the foregoing, together with the summons, to be served upon the newly added Defendants.

/s/ Alfred J. Bennington
Alfred J. Bennington, Esq.

ORLDOCS 16566544 2