**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 9:18-CV-80311-BER**

DIAMOND RESORTS U.S. COLLECTION
DEVELOPMENT, LLC, a Delaware limited
liability company; and DIAMOND RESORTS
HAWAII COLLECTION DEVELOPMENT,
LLC, a Delaware limited liability company,

      Plaintiffs,

v.

U.S. CONSUMER ATTORNEYS, P.A., *et. al.*,

      Defendants.

_____/

## DEFENDANT, DC CAPITAL LAW FIRM, LLP'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant, DC Capital Law Firm, LLP (hereinafter "DC Capital"), hereby moves for Summary Judgment (the "Motion") as described below.

## INTRODUCTION

This dispute arises out of Plaintiffs' strategic anti-consumer efforts to chill timeshare owners' right to seek legal counsel and to prevent DC Capital from petitioning on behalf of those owners who desperately seek their help to break free from Plaintiffs' manipulation, deceptive practices, and financial obligations. Indeed, this lawsuit is just one of many suits filed on behalf of various timeshare conglomerates in a concerted effort to chill consumers' rights. If Plaintiffs are permitted to succeed, timeshare owners will be denied their right to counsel and will be forced to continue in their oppressive and unconscionable agreements with Plaintiffs. DC Capital's Motion for Summary Judgment should be granted in its entirety for the following reasons:

1. Plaintiffs cannot prove that the Newton Defendants engaged in direct false advertising because they have not proffered evidence of injury to reputation or lost sales, consumer deception, or proximate causation. Even if they could (which they cannot), there is no evidence that DC Capital sanctioned, monitored, approved, controlled, or participated in any such advertising;

2.  Plaintiffs cannot prove that DC Capital tortiously interfered with timeshare owner contracts because they cannot establish direct causation, because DC Capital's actions were privileged, and in any event, an attorney-agent cannot interfere with the contracts of its client-principal as a matter of law;

3.  DC Capital is entitled to summary judgment on Plaintiffs' FDUTPA claims because here too, Plaintiffs cannot prove that DC Capital proximately caused them any damages, and because DC Capital, as a law firm, does not fall within the jurisdictional ambit of the FDUTPA statute; and

4.  DC Capital is entitled to summary judgment on Plaintiffs' civil conspiracy claim because Plaintiffs cannot prove an underlying tort or wrong.

Each of these reasons justifies granting summary judgment in favor of DC Capital and will be discussed in greater detail below.

## <u>MEMORANDUM OF LAW</u>

### I.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. Of Pub. Educ.*, 495 F.3d 1306, 1313-14 (11th Cir. 2007). "A court need not permit a case to go to a jury…when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592-94 (1986)). A Court is not required "to accept all the nonmovant's factual characterizations and legal arguments. If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Beal v. Paramount Pictures Corp.*, 20 F.3d 545, 458-59 (11th Cir. 1994).

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120  - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

## II.    DC CAPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' LANHAM ACT CLAIMS

In this action, Plaintiffs allege that DC Capital violated §1125(A)(1) of the Lanham Act by contributing to the Newton Defendants' allegedly false advertising.  *See* Third Amended Complaint ("TAC") ECF No. 272, ¶¶ 114-124.  Specifically, Plaintiffs allege that DC Capital "contributed and continue to contribute to the Newton Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it and/or accepting the benefits of it." *See* TAC ¶ 118.

To prevail on a contributory false advertising claim under the Lanham Act, a plaintiff must first prove the elements of a direct false advertising claim.  *See Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F. 3d 1248, 1277 (11th Cir. 2015). These elements include that "(1) [a] defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decisions; (4) the misrepresented service affects interstate commerce; and (5) [plaintiff] has been, or likely will be, injured as a result of the misleading statement." *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F. 3d 1279, 1294 (11th Cir. 2012). "Once the plaintiff establishes the elements of a direct false advertising claim against a third party, it must [prove] that the defendant contributed to that conduct.  This means that the plaintiff must [prove] that the defendant…'intended to participate in' or 'actually knew about' the false advertising." *Duty Free Ams., Inc.*, 797 F. 3d at 1277.

### A.  Plaintiffs' Cannot Prove Direct False Advertising by the Newton Defendants

Plaintiffs cannot prove direct false advertising by the Newton Defendants because: i) Plaintiffs' experts have not proffered any evidence of injury to reputation or sales, ii) Plaintiffs have not proffered any evidence of consumer deception, and ii) any alleged damages were not proximately caused by the Newton Defendants.[1]

Plaintiffs lack standing to bring a claim under the Lanham Act and cannot demonstrate that any loss to their sales or reputations alleged incurred was caused by DC Capital. Section§1125(A)(1) of the Lanham Act is intended to "protect persons engaged in commerce

---

[1] DC Capital hereby incorporates by reference the Newton Defendants' Motion for Summary Judgment and the arguments set forth therein concerning the alleged direct false advertising against the Newton Defendants.

3

within the control of Congress against unfair competition"—that is, against "injuries to business reputation and present and future sales." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) to an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *See Lexmark*, 572 U.S. at 140 (2014)."[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131. Notably, this requires a plaintiff to show "economic or reputational injury flowing directly from the deception wrought by [a] defendant's advertising; and that [] occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 133; *see also Orange Lake Country Club, Inc. v. Reed Hein & Associates, LLC*, 2019 WL 7423517, at *14 (M.D. Fla. Oct. 4, 2019)(holding that "[t]o succeed on a [direct false advertising] Lanham Act claim, the injury must have 'a sufficiently close connection to the conduct the statute prohibits.'")(internal citations omitted). Here, as discussed below, Plaintiffs lack standing under the Lanham Act because they have not and cannot demonstrate any damages that flow directly from the purported deception attributable to the Newton Advertisements because there is no evidence of any proximate cause to any purported claim of damages by Plaintiffs.

Here, the advertisements at issue include the mailer, the welcome letter, the consumer guide, the statements from the website that Newton is "The #1 Trusted Timeshare Exit Company" and "The #1 Trusted Name in Timeshare Exit," the "Skin in the Game Guarantee," and cold calling, phone agent lead cultivation, voice mail marketing, form emails, fax blasting, and text messaging. See SOF, ¶¶ 29 – 59.

### 1. Plaintiffs' Fail to Prove Injury to Reputation or Sales

In order to show an injury to sales, plaintiffs must establish their "ability to compete" in the marketplace has been diminished. *See Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1168 (11th Cir. 2007) (observing the anomalous decrease in sales are "the type of hard the Lanham Act was intended to redress"). Moreover, the plaintiff *must show* that the defendant's alleged conduct caused plaintiff's sales to decline. *See e.g., Synygy, Inc. v. ZS Assocs.*, 110 F. Supp. 3d 602, 611 (E.D. Pa. 2015); *Tire Kingdom v. Morgan Tire & Auto*, 915 F. Supp. 360, 364 (S.D. Fla. 1996).

4

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Despite engaging four experts to opine on the issues in this litigation, Plaintiffs have utterly failed to present any evidence of damage to reputation or lost sales flowing directly from the Newton Defendants' advertising.[2] As an initial matter, Dr. Bruce Isaacson and David J. Carlson's Expert Reports are silent on damages.[3] [4] Although the Expert Declaration of Jamie McClave Baldwin, Ph.D., draws unsubstantiated conclusions pertaining to "proximity" and statistical "association" regarding timeshare owner default behavior, it too is silent on damages incurred by Plaintiffs. *See* SOF, ⁋ 36 at Exhibit 35.

The only expert testimony provided by Plaintiffs that opines on damages incurred is that of Mr. John C. Jarosz.[5] However, Mr. Jarosz devotes the majority of his analysis to the amount of profits *gained by various defendants to this litigation. See* SOF, ⁋ 31 at Exhibit 37.  Nowhere in his report does Mr. Jarosz analyze reputational damages or lost sales by Plaintiffs. Rather, Mr. Jarosz's report is focused on the points taken back from Diamond Owners who were forced upon and the amount of loan owed after a default, which is not a lost sale.

Even assuming that Mr. Jarosz did proffer an opinion on damages to Plaintiffs' reputation or lost sales (which he did not), his opinions should be excluded regardless because his opinions are utterly unreliable because he fails to verify any of the underlying data purportedly supporting his opinions. *See* Declaration of Steve Berwick, at SOF ⁋ 31 at Exhibit 39. Further, under the Federal Rules of Evidence, an expert must possess certain "knowledge, skill, experience, training, or education" to testify on issues subject to litigation.  Fed. R. Evid. 702.  In his deposition, Mr. Jarosz acknowledged that he has no background or experience relating to the timeshare industry outside of his engagement by Plaintiffs:

---

[2] It is worth noting that Plaintiffs openly acknowledge that they are not seeking damages for reputational injury.  *See, e.g.,* ECF No. 414 at 21-22 (Mr. Crossland: "The damages, whether we're seeking actual damages for…loss of reputation, **we are not**, and that is what I told you a couple of times now…")(emphasis added); ECF No. 430 at 6 (stating that Plaintiffs "have clarified that they are not asking for monetary compensation" for reputational injury).
[3] Dr. Isaacson acknowledges that his survey only measured consumer impressions.  See SOF, ⁋ 34 at Exhibit 34. Nowhere in Dr. Isaacson's 400+ page report does he opine on any injury to either Plaintiffs' reputation or sales.
[4] Mr. Carlson describes his responsibilities as follows:  "I have been retained by Baker & Hostetler LLP ("Baker") to **conduct legal research and provide testimony on several legal issues** arising from the use of a mailer distributed by Newton Group Transfers, LLC…"  See SOF, ⁋ 44 at Exhibit 33. (emphasis added)
[5] Though not addressed in detail in this Motion, neither Dr. Isaacson's Expert Report, Mr. Carlson's expert report, nor any of the other expert testimony provided by Plaintiffs is reliable within their respective areas of inquiry.  *See generally* DC Capital's Respective Daubert Motions filed contemporaneously with this Motion.

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120  - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

> Q:  What about timeshare.  Have you ever been engaged for a timeshare matter before?
> A: **I don't recall ever being engaged for anything that was in the timeshare industry beyond the two matters that we've identified today.**
> Q:  Okay…When you say the two matters we've identified today, you meant this matter and another timeshare matter where you're—you've been engaged by the plaintiffs in this case, right?
> A: **Yes.**

*See* SOF, ⁋ 32 at Exhibit 38.

Mr. Jarosz further admitted that he has been precluded from testifying on multiple occasions prior to this specific litigation and that he has had his opinions limited in numerous other instances:

> Q: Have you ever had any of your opinions struck by a Court?
> A: Yes.
> Q: Can you tell us how many times?
> A: Two times over the years I was precluded from testifying.

*See* id.

> Q: Okay.  Other than those two disqualified opinions that you were attempting to give, has a Court ever limited any opinions you were attempting to give?
> A: Yes, there have been some over the years.
> …
> Q: Okay.  So in summary, on the cases where the Court has limited your opinion, you've named three of those that you recall, there's at least one or two more you're saying you don't recall where your opinion has been limited, correct?
> A: I think that's a fair statement.  Yes.

*See* id.

As Plaintiffs have failed to proffer admissible evidence of Plaintiff's purported damages, this Court should grant summary judgment in favor of the Defendants.  *See, e.g., Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299-300 (4th Cir. 2017)(affirming district court's grant of summary judgment to defendant on Lanham Act claim, noting that loss of sales or reputational injury is "not a minor or technical element of a Lanham Act claim," but rather is a "core[,] indispensable [] element"); *Gravelle v. Kaba Ilco Corp.*, 684 Fed. Appx. 974, 980 (Fed. Cir. April 12, 2017)(affirming summary judgment in favor of defendant on Plaintiff's Lanham Act claim where the evidence was "insufficient to show an economic injury").

6

### 2.  Plaintiffs Abandoned their Reputational Damages

Additionally, Plaintiffs abandoned their claim for injury to reputational damages. *See* Paperless Order (ECF No. 400)("vacating the Court's March 3, 2020 order requiring Plaintiffs' production of profit and loss statements to the Newton Defendants. The order is vacated in light of Plaintiffs' representation to the Court at the July 1, 2020 hearing that they are *no longer seeking reputational damages or damages for loss of goodwill in this case*.") *Id*. (emphasis added). Further, even if they had not abandoned it, there is no evidence in the record to support their reputation has been harmed. Accordingly, Plaintiffs lack standing under the Lanham Act because they have not and cannot demonstrate any damages that flow directly from the purported deception attributable to the Newton Groups' advertising.

### 3.  Plaintiffs' Have Not Proffered Evidence of Consumer Deception

Even assuming Plaintiffs had standing, which they do not, to succeed on a claim for direct false or contributory advertising under the Lanham Act, a plaintiff must prove that a statement deceived, or had the capacity to deceive, consumers. *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F. 3d 1279, 1294 (11th Cir. 2012).  "If the court deems an advertisement to be true but misleading, then a plaintiff must present evidence of deception.[6]" *Gibson v. Resort At Paradise Lakes, LLC*, 2018 WL 10373435, at *13 (M.D. Fla. Feb. 2, 2018).  "In order to prove deception, consumer survey research is often 'key' evidence but…if 'full-blown consumer surveys or market research' are not available, the plaintiff still must provide some sort of expert testimony or similar evidence." *Id.* at *15.

Here, Plaintiffs have utterly failed to proffer any evidence that consumers were deceived by the Newton Defendants' advertisements. Initially, Plaintiffs have not proffered the "key" consumer survey or market research evidence to support their claims.[7] Rather, Plaintiffs' have provided only the expert testimony of Dr. Bruce Isaacson regarding consumer "impressions.[8]"

---

[6] It should be noted that this Court has already held that the Newton Defendant's "Mailer" advertisement "cannot be literally false" when it denied Plaintiffs' Motion for Partial Summary Judgment. *See* ECF No. 404 at 5.

[7] Even Plaintiffs favorite witness Diane Reeve never stated that she was deceived by Newton Defendant advertisements.  On the contrary, Ms. Reeve has stated that she felt deceived by Plaintiffs.  *See* Deposition of Diane Reeve at 141:19 – 141:21.

[8] Dr. Isaacson acknowledges that his "report describes the results of a survey [he] conducted **measuring the impressions conveyed by certain advertising materials**." *See* SOF, ¶ 34 at Exhibit 34.

Even assuming that an "impression" is the equivalent to deception (which it is not), Dr. Isaacson admits that the Newton Defendants' advertisements *did not suggest to the vast majority of timeshare owners that they could be released from their contracts by withholding payments*.[9] Thus, even assuming that such a statement/promise was made (it was not) and is misleading, Dr. Isaacson's testimony fails to create a genuine issue of material fact regarding the majority of Plaintiffs' Lanham Act claims.

Furthermore, federal courts across the country have found Dr. Isaacson's methodology to be generally unreliable before and the same is true in the current litigation. For example, in *Parallel Networks Licensing, LLC, v. Microsoft Corp.*, Civil Action No. 13-2073 (KAJ), 2017 WL 4276036 (D. Del. Sept. 26, 2017), the United States District Court for the District of Delaware granted defendant Microsoft's motion to exclude Dr. Isaacson's expert report where "the survey [was] not adequately linked to the asserted claims" and contained "substantial" omissions. *See* Memorandum Opinion at p. 4-5 (Civil Action No. 13-2073 (KAJ), ECF No. 355). In *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 2009 WL 2366439, at *8 (C.D. Cal. July 28, 2009), the Central District of California held that "[t]he survey conducted by [plaintiff's] expert witness, Dr. Bruce R. Isaacson, does not establish that consumers were likely to be confused…." The court further described Dr. Isaacson's report as "seriously flawed," "leading and unrealistic," "inappropriate," and "exclude[ing] a significant portion of [potential customers]." *Tokidoki, LLC,* 2009 WL 2366439 at *8-9. *See also In re National Collegiate Athletic Association Athletic Grant-in-aid Cap Antitrust Litigation*, 958 F. 3d 1239, 1250-59 (9th Cir. 2020)(stating that Dr. Isaacson's expert report was unpersuasive where "he measured only consumer *preference* and conceded that he did not attempt to study *behavior*" and that "consumer preference 'is not the same thing' as …consumer behavior"); *Dominguez v. UAL Corp.*, 666 F. 3d 1359, 1364 (D.C. Cir. 2012)(stating that "Dr. Isaacson's survey…does not even speak to the relevant question[s] [of the litigation]" and "cannot be used to conclude that [plaintiff was entitled to relief]."

Much like the cases cited above, Dr. Isaacson's report in this litigation too is unreliable. In Florida, expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *See Chapman v. Procter & Gamble Distrib., LLC,* 766 F.3d 1296,

---

[9] In his Report, Dr. Isaacson admitted that the advertising materials communicated or imply to **only a small percentage of timeshare owners** that the Newton Defendants would get them out of their timeshare by having them breach their contract. *See* SOF, ¶ 34 at Exhibit 34.

1305-06 (11th Cir. 2014)(internal citations omitted).  "[I]f an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009)(internal citations omitted).  In his deposition testimony, Dr. Isaacson admitted that he did not speak with any of the actual consumers at issue in this litigation regarding if they were ever actually deceived by Newton Defendant advertisements:

> Q:  Have you spoken to any consumers-at-issue in this case?
> A: **No.**
> Q: Okay.  Did you attempt to speak with any consumers-at-issue in this case?
> A: **No.**
> Q: Did you read any transcripts of consumers-at-issue in this case or deposed previously?
> A: **I don't believe so…**

*See* SOF, ₽ 35 at Exhibit 10.

Not only did Dr. Isaacson not speak with the actual consumers in this litigation; the respondents of his report were not even asked if they have previously hired a third-party exit company:

> Q: Okay.  So but [sic] none of the survey respondents that you included in your survey ever hired a third-party exit company, did they?
> A: I don't know.
> Q:  You didn't ask that question of them, did you?
> A: **I did not ask that question in the survey, that's correct.**

*See* id.

As consumer impressions do not speak to the relevant questions of the current litigation, and as there is simply too great an analytical gap between survey respondents and consumer-at-issue in this litigation, the Court should do as Judge Jordan did in *Parallel Networks Licensing*, strike Dr. Isaacson's Report, and grant summary judgment to DC Capital.

### 4.  <u>Plaintiffs' Purported Damages Were Not Proximately Caused by DC Capital</u>

While Plaintiffs have completely failed to prove damages to reputation or lost sales and consumer deception, even if they could prove such elements of their claim, Plaintiffs still cannot prevail on the merits of their case since Plaintiffs' alleged injury is not proximately caused by its advertisements and, therefore, Plaintiffs lack standing under the Lanham Action. In this action, Plaintiffs claim damages for the non-payment of sums due under promissory notes by the Newton

9

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

CASE NO.: 9:18-CV-80311-BER

Groups' clients or DC Capital's clients. TAC, ¶¶ 91–102, 114-124.  However, that is not a sufficiently close connection to the conduct the statute prohibits. *Lexmark Int'l, Inc.*, 572 U.S. at 133. Thus, Plaintiffs have failed to establish proximate causation. Specifically, Plaintiffs must "show[ing] economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the Plaintiffs. *Id.*

The following evidence demonstrates there is no evidence of Plaintiffs' sales being diverted because of Newton Groups' advertisements:

(1) None of the Newton Defendants' advertisements direct, instruct, or encourage consumers to stop paying on their mortgages or maintenance fees; SOF, ¶¶ 44, 46, 49, 52, 56.

(2) None of the advertisements state anything about Diamond, Diamond Resorts, Diamond Resorts US Collection Development, LLC, or Diamond Resorts US Hawaii Development, LLC; SOF, ¶¶ 43, 45, 48, 51, 55, 58.

(3) There is no evidence that is Newton Defendants' advertisements caused consumers to stop purchasing timeshares; *see supra* at 11-12.

(4) None of the advertisements mention DC Capital. SOF, ¶¶ 29-59.

Thus, none of the advertisements at issue direct the consumer to cease making payments nor are the allegedly false or misleading statements intended to induce such an action. Thus, Plaintiffs' injuries do not flow directly from the deception attributable to the advertisements.  *See, e.g., Westgate Resorts, Ltd. v. Reed Hein & Associates, LLC*, 2020 WL 674108, at *2 (M.D. Fla. Feb. 11, 2020)(granting summary judgment in favor of defendant timeshare exit company where "none of the 33 [purportedly false advertisements] identified by [the timeshare developers] direct (or can reasonably be construed to direct) timeshare owners to stop making payments"); *Club Exploria, LLC v. Austin*, 2020 WL 6585802, at *9 (M.D. Fla. Nov. 10, 2020)(granting summary judgment in favor of defendants by finding "the record evidence does not show that the [timeshare owners] retained [defendant-law firm] because of its [advertising], or that [defendant law-firm] directed the owners to stop making payments to plaintiff[.]");  *Orange Lake Country Club, Inc. v. Reed Hein & Associates, LLC, Mitchell Reed Sussman, Brandon Reed, Trevor Hein and Thomas Parenteau*, M.D. Fla. Case No. 6:17-cv-1542-Orl-78DCI, ECF No. 420 at 29 (granting summary judgment in favor of defendants where "[n]one of the advertisements at issue direct the consumer to cease making payments nor are the allegedly false or misleading statements intended to induce such an

action.   Thus, Plaintiffs' injuries do not flow directly from the deception attributable to the advertisements.");

Furthermore, despite asserting violations of the Lanham Act for 425 consumers. Plaintiffs have deposed a total of seven DC Capital clients.[10]  See SOF, ℙ 65 at Exhibit 25.  Of those clients, the majority clearly testified that **no one from DC Capital ever instructed them to stop making payments on their timeshare contracts**.  For example, Helen Washer testified that she wanted to exit her timeshare before ever hiring DC Capital, and that DC Capital never instructed her to stop making payments to Plaintiffs:

> Q: Do you know if your husband was ever instructed by anyone to stop making payments to Diamond Resorts?
> A:  Do I know was my husband instructed by either of those two to stop payments—
> Q: Yes, ma''am
> A: --is that what you're asking me?
> Q: Yes, ma'am.
> A: **Um.  Yes, I do know that no one instructed him to do so.**

*See* SOF, ℙ 72

DC Capital client Jefferson Kline also noted that his decision to stop payments had nothing to do with DC Capital:

> Q: …Why is it that you stopped making payments after January 7th, 2019?
> A: Because my income level changed and because I was diagnosed….
> Q: Other than your diagnosis and the issues related to your prostate cancer, were there any other reasons you stopped making payments on your loan to Diamond Resorts in 2019?
> A: **Well, I changed careers.  Not really.  I mean, I changed the way I make money**.

*See* SOF, ℙ 68

The record evidence is replete with numerous examples that neither the Newton Defendants nor DC Capital ever instructed its clients to stop making payments on their timeshare contracts:

> Q: Why did you stop making [] payments?
> A: We believe that we were misled with both the amounts that we were paying and the terms of the payments.

---

[10] These clients are, respectively: Diane Reeve, Helen Washer, Horacio Gonzalez, Jefferson Kline, Roger Fladeboe, Milton Rebbert, and Stephanie Tone.

CASE NO.: 9:18-CV-80311-BER

Q: Were you ever told that you needed to stop making the maintenance fee and mortgage payments so that DC Capital or the Newton Group could do anything for you to achieve an exit from your timeshare interest with Diamond Resorts?
A: **No….I have not had communication with Newton Group or with my attorney regarding stopping payments.  This was a decision I've made clear that we made.**

*See* SOF, ⁋⁋ 74.

Q: When did you stop making payments relating to your timeshare interest with Diamond Resorts?
A: I think around June of 2018.
Q: Did anyone ever advise you to stop paying your financial obligations relating to the timeshare interests?
A: Yes.
Q: Who was that?
A: **It was actually Wesley Financial.**

*See* SOF, ⁋ 80 at Exhibit 30.

Q: Did you ever tell clients that they should just stop paying their financial obligations to a timeshare association or developer in order to put pressure on them?
A: No.
Q: Did you ever tell any time – any client…to stop making payments to a timeshare developer or timeshare association?
A: **No.**

*See* SOF, ⁋ 65 at Exhibit 40.

Despite the overwhelming evidence that DC Capital did not instruct its clients to stop payment on their contracts with Plaintiffs, DC Capital is aware of one client—of hundreds—that has testified that her attorney instructed her to stop payment.  That client is Diane Reeve.  However, for reasons addressed below in Section V, summary judgment should still be awarded in favor of DC Capital on the overwhelming number of clients because Plaintiffs have not proffered evidence that DC Capital proximately caused timeshare owners to stop payment.

## 5. <u>Failure to Prove Proximate Causation is Fatal to Plaintiffs' Claim for Disgorgement of Profits</u>

Plaintiffs also fail to demonstrate entitlement to monetary recovery under the Lanham Act– in the form of disgorgement of DC Capital's revenue. Under the Lanham Act, "[i]f [a] plaintiff seeks damages based…upon [a] defendant's profits, plaintiff is faced with the traditional problems of proving an actual diversion of customers from itself to defendant." 5 J. Thomas McCarthy,

*McCarthy on Trademarks and Unfair Competition* § 27:42 at 27-104 (4th ed. 2013); *see also Retractable Tech., Inc. v. Becton Dickinson & Co*., 919 F.3d 869, 876 (5th Cir. 2019) (holding that "[w]here a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefited from the alleged false advertising, the plaintiff *will not be permitted* to recover any of the defendant's profits."

 As addressed above, there is no record evidence that DC Capital proximately caused any of their clients to stop making payments on their timeshare contracts.  Numerous federal courts throughout the nation have encountered this same issue and uniformly held that a plaintiff must establish proof of causation to qualify for possible disgorgement.  *See TrafficSchool.com, Inc. v. Edriver Inc*., 653 F.3d 820, 831 (9th Cir. 2011) (denying damages where plaintiff failed to produce any proof of past injury or causation; the standard that applies to comparative advertising cases regarding causation is not relevant in non-comparative advertising cases); *Logan v. Burgers Ozark Country Cured Hams Inc*., 263 F.3d 447, 465 (5th Cir. 2001) ("[W]here a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefitted from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C. §1117(a)").

 Here, Plaintiffs have not even attempted to demonstrate causation for the overwhelming majority of timeshare owners.  Of the 425 clients allegedly at issue for Lanham Act claims, Plaintiffs deposed a total of seven DC Capital clients.  *See* SOF ⁋ 65 at Exhibit 25.  Of those seven, six testified that DC Capital did not direct them to stop making their timeshare payments.  SOF, ⁋⁋ 68, 70, 72, 75, 80, 84.  As there is no genuine issue of material facts pertaining to proximate causation, Plaintiffs are not entitled to the disgorgement of DC Capital's profits as a matter of law.

**B) Plaintiffs Cannot Prove Contributory False Advertising Under the Lanham Act.**

 Even if Plaintiffs could succeed on their direct false advertising claim against the Newton Defendants (which they cannot), Plaintiffs have proffered zero evidence that DC Capital sanctioned, monitored, approved, controlled, or participated in any statements made by the Newton Defendants.  *See Duty Free Ams., Inc.,* 797 F. 3d at 1278 (dismissing a contributory false advertising claim where plaintiff could not prove that the defendant "induced or knowingly or intentionally participated in any…allegedly false statement…").  Indeed, the record evidence indicates that DC Capital is a separate entity from the Newton Defendants and that the Newton Defendants have no bearing on DC Capital strategy and/or decisions:

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120  - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Q: …I'm wondering is it your testimony that you never communicated with clients and lawyers about what was going on at DC Capital?

A: I could never provide updates on what the attorneys were doing. **I didn't have access to the information from the DC Capital Law side.  It was completely separate from Newton Group.**  If a client had called in wanting an update, we would refer them to their attorney at DC Capital.

*See* SOF, ⁋ 27 at Exhibit 43.

> A: …**We had a separate office for DC Capital Law.**
> Q: And that was built out once DC Capital was formed?
> A: Correct.
> Q: Okay.  And so he changed—is it like just one big building and then they built a wall or what happened when DC Capital was formed?
> A: Yeah, it was one big building, and **there was a separate area that you had to badge scan to get in.**
> Q: **And that was DC Capital's office**?
> A: **Correct**.
> Q: Okay.  And that—that separate scanned area that you had to use a badge to scan in, that was—that did not exist prior to formation of DC Capital?
> A: Correct.

*See id.*

> Q: Isn't it true there came a time when DC Capital Law Firm stopped telling Diamond it was representing owner?
> A: **I wouldn't have any idea about their operations.**

*See* SOF, ⁋ 27 at Exhibit 44.

Former Newton Defendant employees have even testified that they have not even communicated with individuals at DC Capital:

> Q: To your knowledge, did you ever communicate with anybody at DC Capital?
> A: **Not to my knowledge, no, sir.**

*See id.* at Exhibit 45.

Regarding the marketing materials and advertisements created by the Newton Defendants, the record is clear that Newton Group has its own marketing team responsible for such ads:

> Q: Okay.  In terms of marketing materials, do you know who creates the marketing materials for The Newton Group?
> A: **There was a marketing team at Newton Group.**

*See id.* at Exhibit 43.

Although there are non-lawyer partners of DC Capital[11] that are also associated with the Newton Defendants, the record evidence demonstrates that they are not involved in DC Capital's normal operations and that they don't even receive income from DC Capital for their services:

> A:…**once a file ha[s] been assigned to DC Capital, typically Newton would stay in the background, allowing the attorney and the law firm to do what they were hired to d**o, and try not to interfere with the ongoing representation.

*See* SOF, ⁋ 28 at Exhibit 2.

> A: So the non-attorney partners [of DC Capital] do not provide legal services **nor do they have any say**, and they particularity will (inaudible) strategy that we choose for our clients….

*See* id. at Exhibit 9.

> Q: What about Gordon Newton, does he have a title?
> A: He's a non-attorney partner.
> Q: What are the roles and responsibilities of Mr. Newton for DC Capital?
> A: **Gordon does not have day-to-day responsibilities.**

*See* id.

> Q: And are you [Theo Panopouplos] the CEO of Newton Group Exit, LLC?
> A: Yes.
> …
> Q: Do you receive income from DC Capital Law firm?
> A: **No.**

*See* SOF, ⁋ 27 at Exhibit 2.

Importantly, even if the non-lawyer partners of DC Capital were involved in its day-to-day operations of DC Capital (which they are not), this factual proposition still would not establish that the non-lawyer partners in any way participated Newton advertising. As the record is void of evidence suggesting that DC Capital participated in any way or knew about any allegedly false ads, the Court should grant summary judgment in favor of DC Capital on this count.

## 6. DC CAPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS

---

[11] The non-lawyer partners of DC Capital are Chuck Anderson, Gordon Newton, Theo Panopouplos, and Todd Johnson.

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120  - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

### a. Plaintiffs Cannot Prove DC Capital Caused Timeshare Owners to Breach Their Contracts

The Court should grant DC Capital's Motion with respect to Plaintiffs' claims of tortious interference because Plaintiffs cannot prove that DC Capital instructed timeshare owners to stop payments on their contracts. Indeed, many federal cases in Florida have encountered this exact same issue and granted summary judgment in favor of the defendant. In *Club Exploria,* LLC, the Middle District granted summary judgment in favor of the defendants where "there [was] no evidence that [the defendant]…caused the [timeshare] owners to believe that they no longer needed to make payments." 2020 WL 6585802, at \*5. *Club Exploria, LLC* involved a company that specialized in selling timeshare interests suing a law firm for its representation of the timeshare owners. In addition to seeking damages under the Lanham Act, plaintiff Club Exploria, LLC also sought relief under a theory of tortious interference with contract. *See Id.* Granting summary judgment in favor of the defendants on the tortious interference count, the Court specifically noted that "[t]he fact that [timeshare owners] stopped paying after hiring [defendant] **is not enough to convince a reasonable jury that [defendant] intentionally caused the [timeshare owners] to breach their contracts**." *Id.* (emphasis added)

Similarly, in *Westgate Resorts, Ltd. v. Sussman*, 2019 WL 3848805 (M.D. Fla. July 26, 2019)("*Sussman I*"), the Middle District rejected statistical correlation between a timeshare developers receipt of a letter of representation and the subsequent cancelling of payments from timeshare owners as sufficient evidence to prove causation on a tortious interference claim. Explaining that "[p]laintiffs' continued reliance on the 'temporal proximity' of owners stopping payments around the time a letter of representation" is sent amounts to "correlation, not causation," *Sussman I*, at \*2, fn. 3, and that "**[i]n no circumstances will the Court allow [such a case] to proceed to a jury when it hangs on such loose evidentiary threads….**" *Id*. at \*2. (emphasis added)

Exactly like the facts in *Club Exploria, LLC*, and *Sussman I,* here, Plaintiffs fail to proffer any evidence that DC Capital in any way caused timeshare owners to cancel or withhold payments on their timeshare contracts.   On the contrary, the record evidence proves that other than one client, Diana Reeve, all other clients of DC Capital were pre-disposed to breach their contracts and were never instructed by DC Capital to withhold payment. *See supra* at 11-12.   To the extent that any clients testified otherwise, such claims should be dismissed as DC Capital was acting at that

client's agent and because DC Capital's actions were privileged as a matter of law.[12]  *See infra* at 18-20.

### b.  Plaintiffs Expert Testimony Does Not Prove Causation

Much like the deposition testimony of DC Capital's clients, Plaintiffs' expert testimony does not support Plaintiffs' claims either. In expert Jarosz's report, Mr. Jarosz himself admits that "Diamond Owners…would have defaulted even in the absence of [alleged misconduct]."  *See* SOF, ⁋ 36 at Exhibit 37.  Similarly, in support of this admission, expert Jarosz cites to Plaintiffs' statistics expert, Jamie Baldwin.  Dr. Baldwin's Report too is void of any discussion of a causal relationship between timeshare owner's cancellation of payments and their interaction with DC Capital, performing only a regression model that does not speak to causation.  *See* SOF, ⁋ 36 at Exhibit 35.

Although linear regression analysis is a common tool used to determine the effect of dependent variables on independent variables, such analysis alone cannot determine causation. *See, e.g., Winn-Dixie Stores, Inc. v. Dolgencorp, LLC,* 862 F. Supp. 2d 1322, 1331 (S.D. Fla. 2012)(noting that "[c]ausality cannot be inferred by data analysis alone….Even when an appropriate theory has been identified, causality can never be inferred directly.  One must also look for empirical evidence that there is a causal relationship"); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000)(explaining that the Supreme Court has concluded that some regression models may be "so incomplete as to be inadmissible as irrelevant"); *Rosa v. Florida Coast Bank,* 484 So. 2d 57, 58 (Fla. 4th DCA 1986)(noting that "[o]ne of the essential elements of a claim for intentional interference…is that the inference be…direct…").

Indeed, multiple case authorities in U.S. District Courts in Florida have specifically rejected such loose evidentiary support to withstand a motion for summary judgment.  \\*See Westgate Resorts, Ltd. v. Reed Hein & Associates, LLC*, 2020 WL 674108 at *3 (noting that where "clients were predisposed to breach their timeshare contracts before hiring [defendants]…this would defeat [plaintiff's] claim [of tortious interference]"(emphasis added); *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. 5th DCA 1999)(explaining that where a party "argues that he cannot be held liable for interference with [a] contract because there was no evidence to support a finding that he

---

[12] Even if, in an abundance of caution, this court does not decide to grant summary judgment on Ms. Reeve's claim, summary judgment is still warranted for the other 400+ clients.

induced [] breach[,] [the Court] agree[s]").  As Plaintiffs cannot prove a causal relationship, DC Capital is entitled to summary judgment on Plaintiffs' tortious interference claims.

### c.     An Agent Cannot Tortiously Interfere With Its Principal's Contract

Furthermore, DC Capital is immune from liability under a theory of tortious interference with contract because it was acting as an agent of its clients.  *See Jarzynka*, 310 F. Supp. 2d at 1267.  *See also Johnson v. Estate of Fraedrich*, 472 So. 2d 1266, 1268 (Fla. 1st DCA 1985)(holding that "an attorney is generally viewed as the agent of his client" and that "[a]n act done by an agent on behalf of the principal within the scope of the agency is not the act of the agent but of the person by whose direction it is done"); *Palm Beach Cnty. Health Care Dist. V. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4ᵗʰ DCA 2009)(holding that "[f]or [tortious interference] to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship"); *Parker v. Gordon*, 442 So. 2d 273, 276 (Fla. 4th DCA 1983)(noting that professional counsel, being under a duty to advise his or her clients, is not liable for tortious interference with a business relationship); *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014)(noting that "non-strangers generally have a 'privilege to interfere' with [a] business relationship…").

In addition to the numerous case authorities cited above, legal ethics expert Jan Jacobowitz has also testified that "[a]dvising a client on various strategies for terminating a **contract does not constitute tortious interference in relation to that contract; rather it constitutes protected legal advice.**"  *See* SOF, ⁋ 37 at Exhibit 46. (emphasis added).  In her Report, Ms. Jacobowitz explained that, under the Rules of Professional Conduct of both the state of Florida and the District of Columbia, a lawyer's advice to his or her client is not only privileged, but also **may include a full range of options** so long as the lawyer is not advising or assisting in fraud or criminal conduct.  *Id.*.  "Based upon the legal ethics rules and relevant case law, the tortious interference allegation against DC Capital is inappropriate and a dangerous assault on the sanctity of the attorney-client relationship." *Id*.

Regarding Ms. Reeve's allegation that DC Capital instructed her to withhold payment, even if true, it is undisputed that she entered into an attorney-client relationship with DC Capital. *See* SOF, ⁋ 88 at Exhibit 32.  In other words, the purported advice was rendered by an attorney to a client.  This is the exact situation that Ms. Jacobowitz addresses in her opinion.  In this regard,

DC Capital is entitled to summary judgment on the tortious interference count pertaining to Ms. Reeve.

Furthermore, the expert testimony of Ms. Jacobowitz clearly supports not only DC Capital's right—rather, its ethical obligation—to advise clients on the full range of options pertaining to their legal issues, *even if such advice involved withholding payments* (which it did not). *See* SOF, ⁋ 37 at Exhibit 46. As there is no genuine issue of material fact pertaining to DC Capital's agency relationship with Ms. Reeve's and its ethical obligations under the DC and Florida Rules of Professional Conduct, this Court should grant summary judgment in favor of DC Capital on *all* tortious interference claims—including Ms. Reeve.

### d. Any Alleged Interference Is Justified as a Matter of Law

Even assuming an agent could tortiously interfere with the contracts of its principal (which it cannot) and that DC Capital was somehow prevented from counseling its clients to stop payment (which it was not), DC Capital would still not be liable for tortious interference as its actions were justified and thus privileged as a matter of law.

Under Florida law, "[a] cause of action for tortious interference requires a showing of…**a lack of justification** to take [] action which cause[s]…damages." *Networkip, LLC v. Spread Enterprises, Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006)(emphasis added). The U.S. District Court for the Southern District of Florida has held that "a defendant's interference will be privileged *unless* the plaintiff [proves] the defendant's motive is purely malicious and not coupled with any legitimate competitive economic interest." *Diversified Mgmt. Sols, Inc. v. Control Sys. Research, Inc.*, 2016 WL 4256916, at *8 (S.D. Fla. May 16, 2016)(citing *Heavener, Ogier Services, Inc. v. R.W. Florida Region, Inc.*, 418 So. 2d 1074, 1077 (Fla. 5th DCA 1982))(emphasis added).

Indeed, not a single client nor DC Capital attorney (including, Mr. Scott Olifant or Brian Parker) have even alleged malicious conduct or ulterior motive by DC Capital. While Plaintiffs may disagree with their timeshare owners' decision to seek legal counsel, simply providing legal services to individuals is hardly the malicious conduct required by law. *See Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA 1980)(noting that "if the privilege to…further ones legitimate economic situation is present, the concomitant presence of malice or ill will…is not actionable as tortious interference"); *Jones v. Braxton*, 379 So. 2d 115, 117 (Fla. 1st DCA 1979)(noting that it is not illegal to break a private contract; rather, it is, at best, a breach of

19

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

contract). Similarly, there is zero evidence of an ulterior motive in rendering legal services to clients. Put simply, DC Capital does not tortiously interfere with Diamond contracts because "professional counsel, being under a duty to advise his clients, is not liable for [tortious] interference." *Parker v. Gordon*, 442 So. 2d 273, 276 (Fla. 4th DCA 1983); *see also Richard Bertram, Inc.*, 820 So. 2d at 965. Consequently, DC Capital is entitled to summary judgment as to Plaintiffs' tortious inference with contract.

### 7. Florida Court Do Not Extrapolate Damages From Separate and Distinct Claims

Importantly, to the extent Plaintiffs can proffer evidence of causation on any of its counts, such evidence should be restricted solely to the specific, individual owners directly providing such evidence. In *Westgate Resort, Ltd. v. Sussman*, 2019 WL 3836534 (M.D. Fla. Aug. 15, 2019)("*Sussman II*"), plaintiff-timeshare developer was attempting to recover damages from the defendant for the 175 owners that allegedly stopped payment on their timeshare contracts. *See id.* at *1. Noting that plaintiff's allegations were essentially "175 separate claims…and 175 sets of circumstances surrounding each owner's nonpayment," the Middle District specifically rejected extrapolating damages based on the testimony of five owners:

> [The plaintiffs] want me to infer that all the damages from the breach are all the profits that [defendants] made….*And I think I would have to make a leap of faith there…. since [the timeshare developer] missed the boat on establishing causation for the 175 outstanding* owners… their [] evidence doesn't speak to [the majority of] owners'…nonpayments….

Id. at *2-3.

The Court further explained:

> Plaintiffs' strategy in this case (using exemplars to extrapolate damages…) hasn't borne fruit….Where the rubber hits the road is when a party tries to squeeze [voluminous] distinct claims based on separate contracts and individual circumstances into one case and leave out evidence from 97%...of [the] owners.

*Id.* at *4-5. (emphasis added)

Here, Plaintiffs are asserting that DC Capital tortiously interfered with 129 contracts. SOF, ¶ 65 at Exhibit 25.  Despite such a broad accusation, Plaintiffs only deposed seven (7) DC

Capital clients.[13] These facts demonstrate that there is simply no basis for Plaintiffs to move forward on the majority of their claims.  Even if Plaintiffs can proffer evidence purporting to show causation for the extremely limited number of timeshare owners that were actually deposed (which they cannot), the Court should still enter summary judgment in favor of DC Capital on the vast majority of Plaintiffs' claims.  *See also Sussman I* at *2 (noting that "even [if a] very small sample of owners" demonstrate causation, "the Court will not allow Plaintiffs to dub these owners 'exemplar' and extrapolate these owners' experiences with Defendants to every owner who stopped paying…").  Accordingly, DC Capital is entitled to summary judgment on Plaintiffs' tortious interference claims.

### 8.   PLAINTIFFS FAIL TO PROVE CAUSATION AND OTHER STATUTORY REQUIREMENTS TO SUCCEED ON THEIR "FDUTPA" CLAIMS

Plaintiffs also allege that DC Capital engaged in unfair and deceptive trade practices that caused them to incur financial losses.  *See* ECF No. 272, §§ 160-171.  The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits businesses from engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any **trade or commerce**…."  Fla. Stat. § 501.204(1)(emphasis added).  To succeed on a claim under FDUTPA, a plaintiff must prove "(1) a deceptive or unfair trade practice; (2) causation; and (3) actual damages."  *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013).

### a.   DC Capital Did Not Proximately Cause Plaintiffs Damages

The Court should grant summary judgment in favor of DC Capital because the record is void of any evidence that Defendants directed the majority of timeshare owners to stop making payments on their contracts. *See* SOF, ¶¶ 44, 46, 49, 52, 56.

In *Westgate Resorts, Ltd. v. Reed Hein & Associates*, the plaintiff-timeshare developers alleged that the defendant-law firm "violated FDUTPA by, among other things, utilizing false statements in its ads or marketing materials that have the effect of deceiving consumers…."  2020 WL 674108 at *4.  Noting that "the [d]efendants make the same causation argument in regard to the FDUTPA claim as they made in regard to the Lanham Act claim—*i.e.*, that none of the **allegedly false or misleading ads or material direct [timeshare owners] to stop making**

---

[13] These clients are, respectively: Diane Reeve, Helen Washer, Horacio Gonzalez, Jefferson Kline, Roger Fladeboe, Milton Rebbert, and Stephanie Tone.

CASE NO.: 9:18-CV-80311-BER

**payments to [plaintiff],**" the Court granted summary judgment in favor of the defendant-law firm. *Id.* (emphasis added).  As the majority of DC Capital clients do not even claim that they were instructed by DC Capital to stop payment, *see supra* at 11-12, the Court should grant summary judgment in favor of DC Capital for this reason alone.

### b.  DC Capital is Not Engaged in Trade or Commerce

Even if DC Capital did instruct its clients to withhold payment on their timeshare contracts (which they did not), all counts pertaining to Plaintiffs' FDUTPA claims too should be dismissed because DC Capital is a law firm that is not engaged in "trade or commerce" as defined by the statute.  In *Club Exploria, LLC*, the Middle District granted summary judgment in favor of a defendant-law firm under FDUTPA despite allegations of false and misleading advertising by the plaintiff where defendants "advertising…[was] in pursuit of a legal remedy." 2020 WL 6585802 at *8.  Noting that "website advertising, if unconnected with the practice of law, may constitute 'trade or commerce'" under FDUTPA, the Court granted summary judgment to the defendant where the advertising "**[was] in pursuit of a civil legal remedy**" and the defendant "**[did] not avoided judicial involvement while handling clients' cases.**" *Id.* (emphasis added)

Much like the situation in *Club Exploria, LLC*, DC Capital provides its clients with a legal remedy and does not avoid judicial involvement while handling owners' cases.  Indeed, DC Capital has assisted in numerous arbitrations and other legal proceedings on behalf of the timeshare owners. *See* ECF No. 676-11. Such activity does not meet the statutory requirements of "trade or commerce" under FDUTPA, this Court should grant summary judgment in favor of DC Capital.

### 9.  DC CAPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONSPIRACY CLAIMS

Finally, to adequately prove a cause of action for civil conspiracy in Florida, a plaintiff must prove a) an agreement between two or more parties, b) to do an unlawful act by unlawful means, c) the committing of an overt act in pursuance of the conspiracy and d) damage to the plaintiff as a result of the act.  *See, e.g., Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006).  Generally, an actionable conspiracy requires an actionable underlying tort or wrong.  *Id. See also Kent v. Kent*, 431 So. 2d 279, 281 (Fla. 5th DCA 1983)(holding that "ordinarily there can be no independent tort for conspiracy")(emphasis added)*; Wright v. Yurko*, 446 So. 2d 1162, 1165 (Fla. 5th DCA 1984)(noting "[a]n act which does not constitute a basis for a cause of action…cannot be made the basis for…conspiracy")(emphasis added); *Buchanan v. Miami Herald*

22

CASE NO.: 9:18-CV-80311-BER

*Pub. Co.*, 230 So. 2d 9, 12 (Fla. 1969)(holding that "the District Court was…correct in holding that…conspiracy to commit malicious prosecution failed" since the underlying count of malicious prosecution failed); *Abromats v. Abromats*, No. 16-cv-60653-BLOOM/Valle, 2016 WL 4917153 at *5 (S.D. Fla. 2016)(holding that "because the Court dismiss[ed] the underlying tort actions, [the conspiracy count] is dismissed with prejudice as well")(emphasis added); *Hercules Capital, Inc. v. Gittleman*, No. 16-cv-81663-MIDDLEBROOKS, 2018 WL 395489 at *24 (S.D. Fla. 2018)(holding that since defendant was not liable for the underlying torts, "there is no underlying 'unlawful act'…on which to base a civil conspiracy claim")(emphasis added).

In the TAC, Plaintiffs allege that the DC Capital conspired to interfere with their existing and future contractual relations.  *See* ECF No. 272, ¶¶ 147-159.  However, as described in detail above, Plaintiffs have failed to prove any of their claims regarding alleged violations of the Lanham Act, tortious interference with contractual relations, or violations of FDUTPA.  As Plaintiffs cannot prove an underlying tort on which to base their conspiracy claim, DC Capital is entitled to summary judgment on the civil conspiracy claim.

### 10. Injunctive Relief

For the reasons set forth herein, Plaintiffs also are not entitled to an injunction against DC Capital.

### CONCLUSION

**WHEREFORE**, based upon the foregoing, DC Capital respectfully moves this Honorable Court for an order granting summary judgment on all claims set forth in Plaintiffs' Third Amended Complaint.

Dated: September 23, 2021                    Respectfully submitted,

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendants DC Capital Law Firm, LLP, Newton Group Transfers, LLC, The Newton Group, ESA LLC, Interval Broker Direct, LLC, and Newton Group Exit, LLC*
Esperante Building
222 Lakeview Avenue, Suite 120
West Palm Beach, Florida 33401
Telephone (561) 612-3459
Facsimile (561) 683-8977
Primary e-mail: jonathan.vine@csklegal.com
Primary e-mail: sheena.smith@csklegal.com

23

CASE NO.: 9:18-CV-80311-BER

By:   s/Sheena Smith
          JONATHAN VINE
          Florida Bar. No.: 10966
          SHEENA SMITH
          Florida Bar No.:  118919

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that that on this 23rd day of September 2021, the foregoing document is being served by electronic mail on all counsel of record or pro se parties identified on the attached Service List.

/s/ Sheena D. Smith
Sheena D. Smith

## SERVICE LIST

Brandon Crossland, Esq.
Julie Brady, Esq.
Catherine E. Woltering, Esq. *(Pro Hac Vice)*
**BAKER & HOSTETLER LLP**
200 S Orange Ave #2300
PO Box 112
Orlando, FL 32802-0112
bcrossland@bakerlaw.com
jsingerbrady@bakerlaw.com
cwoltering@bakerlaw.com
*Counsel for Diamond Resorts U.S.*
*Collection Development, LLC and*
*Diamond Resorts Hawaii*
*Collection Development, LLC*

John Joseph Bennett, Esq.
Michael Anthony Nardella, Esq.
**Nardella & Nardella PLLC**
135 W. Central Blvd.
Suite 300
Orlando, FL 32801
Telephone: 407-966-2680
Fax: 407-966-2681
Email: jbennett@nardellalaw.com
service@nardellalaw.com

Javier A. Lopez, Esq.
Dwayne A. Robinson, Esq.
**KOZYAK TROPIN &**
**THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, Florida 33134
jal@kttlaw.com
nm@kttlaw.com
drobinson@kttlaw.com
ems@kttlaw.com

Jeffrey Wittenberg, Esq. (*Pro Hac Vice*)
**WITTENBERG LAW APC**
401 Wilshire Blvd., Floor 12
Santa Monica, CA 90401
jeffrey@wittenberglawyers.com

Mitchell Reed Sussman, Esq. *(Pro Hac Vice)*
**Mitchell Reed Sussman & Associates**
1053 S. Palm Canyon Dr
Palm Springs, CA 92264
Telephone: (760) 325-7255
Email: raventv1@aol.com
raventv1@aol.com

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 120 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX